## GOTTLIEB *v.* THATCHER.

### (*Circuit Court, D. Colorado.* March 21, 1888.)

1. JUDGMENT—OPERATION AND EFFECT—CONCLUSIVENESS AS TO PRIOR GRANTEES.

> As against a prior grantee and purchaser at an execution sale under a preceding judgment, a subsequent judgment against the grantor and debtor is not conclusive, either as to the amount of the debt, or as to the circumstances and character of the transaction out of which the indebtedness arose, and where made defendant to a bill by the holder of such judgment to set the conveyance aside as in fraud of debtors, and to subject the land, such prior grantee and purchaser may show that the debt for which the judgment was

[1]Reported by Edward G. Benedict, Esq., of the New York bar.

rendered had been more than paid when the judgment was obtained and that the creditor had taken an unfair advantage of the debtor in the matter of interest.

2. FRAUDULENT CONVEYANCES—ACTIONS TO SET ASIDE—BY CREDITOR WHOSE DEBT HAS BEEN PAID.

The keeper of a house of ill fame, having bought $6,000 worth of furniture, borrowed of G., who had negotiated the sale, $2,700, to apply to the purchase money. She gave him her note for that amount, with an accommodation indorser, secured on the furniture, and, in addition, on 320 acres of land belonging to the indorser. This note bore interest at 5 per cent. a month. She was also charged $300 as a bonus, and gave G. her note for that amount. She paid $910 as interest on the first note, and having then defaulted, G. seized the furniture, and sold it at auction for $1,519.43. He also foreclosed on the land, and got from it $253.10, thus realizing, with interest, $2,682.53 on a debt of $2,700 in about a year. He then sued the indorser for the full amount of the note, and, the defendant's attorney being drunk at the trial, and a new man being assigned in his stead, got a judgment against him for $2,171. When this suit was commenced, he issued a writ of garnishment, and thus came into possession of a note for $1,350, secured on lands worth many thousands of dollars. This note was advertised for sale without any reference to the security, and bought in for $80 by G., who foreclosed, and took the land. He then filed a bill against the brother of the indorser, who had bought in certain land of the indorser at an execution sale under a judgment rendered against him prior to his indorsement on the $2,700 note, setting up that he had levied on the land to satisfy his judgment for $2,171, and bought it in, and that the purchase by and the deed to the brother was the result of conspiracy to defraud creditors. *Held*, that under the circumstances the bill should be dismissed, the creditor having, in equity, been more than paid in full.

In Equity.

J. W. Horner and A. J. Bentley, for complainant.

H. C. Dillon, for defendant.

BREWER, J. This case is now before me on final hearing. The facts are these: On July 23, 1877, complainant recovered judgment in the district court of Arapahoe county for $2,171, against Samuel H. Thatcher, a brother of defendant. On November 13, 1876, Samuel H. Thatcher conveyed to defendant, by warranty deed, for an expressed consideration of $4,000, the lands in controversy. Complainant caused execution to issue on his judgment, levied upon the lands as the property of Samuel H. Thatcher, bought them in, and now seeks to have this warranty deed set aside as a cloud upon his title, and such title quieted as against all claims of defendant. He insists that that deed was fraudulent and void, because made by Samuel H. Thatcher with intent to defraud his creditors, complainant among the number.

Many questions are raised and discussed by counsel. In the view which I have taken of this case I shall have occasion to refer to but one or two, and, in order to present these, some other facts must be stated. The judgment against Samuel H. Thatcher grew out of these transactions: In November, 1875, one Zella Glenmore, the proprietress of a house of ill fame, purchased a lot of furniture from Rhoda Sevins, the proprietress of a like house. She borrowed $2,700 of complainant; gave her note with Samuel H. Thatcher's indorsement for that amount. This note was secured by a chattel mortgage on the furniture, which at

the time was worth $6,000; also by trust deed on 320 acres of land in Douglas county, belonging to Thatcher. Thatcher had no interest in the transaction, and was only an accommodation indorser. The note ran one year, and drew 5 per cent. per month interest. At the time of taking this note complainant also took a note for $300, signed by Zella Glenmore alone, which note was given to him, as he says, for his services in making the trade between the two women. According to his testimony, Zella paid six months' interest, and $100 on the seventh months' interest, or $910 in all. Zella testifies that she paid 11 months' interest. It may be, however, that her testimony is not properly before the court, as, when her deposition was taken, the issues were different; and under an order made by this court after the issues were put in their present shape she was not produced for cross-examination. When the year for which the note was given expired, and in November, 1876,— perhaps on the day before the note matured,—complainant seized the furniture under his chattel mortgage, and caused it to be sold at public auction. From this, by his own testimony, he realized $1,519.43, in December, 1876. The trust deed on the Douglas county lands he also enforced, and from that realized $253.10. Thus, according to his own testimony, he received $2,682.53 from Zella Glenmore personally, and from the mortgaged property. Nevertheless he commenced suit for the full amount of the note against Thatcher, and recovered judgment, as has been stated, for $2,171. When the case was called for trial, Thatcher's counsel was intoxicated, and the case was continued a few hours, until new counsel could be substituted,—counsel who had no previous knowledge of the transactions,—and under those circumstances the case was tried. At the time of commencing the suit against Thatcher, he garnished Gray and Eichaltz, and from them obtained possession of a note for $1,350 belonging to Thatcher, secured by deed of trust on 20 acres of land worth more than the amount of the note. Although this note was thus secured, it was advertised for sale without any notice of the security, and bid in by him for $80. Thereafter he had the trust deed foreclosed, and under that foreclosure obtained title to the lands now shown to be worth many thousand dollars. It is true that this advertisement and purchase of this note by him was not until after the purchase of the lands in controversy, but the fact that the note was thus secured was disclosed by the records in the case prior to its advertisement and sale. Again, on May 7, 1875, before even the borrowing of the money by Zella Glenmore, one Samuel Kaucher had obtained judgment against Thatcher in the district court of Arapahoe county, for $2,710.40. This judgment was taken on error to the supreme court of the territory,[1] and thence to the supreme court of the United States, and by each court affirmed,—by the latter on December 17, 1877. On this judgment execution was issued on January 29, 1878, the land bought by defendant, and deed made to him November 15, 1878.

There is a question in the case as to whether the lien of this judgment

[1] 2 Colo. 698.

had not been lost, but I do not care to pursue an inquiry into that question. Returning to the facts previously noticed, it may be stated that the judgment of July 23, 1877, is conclusive between complainant and Samuel H. Thatcher as to his indebtedness; but it is not conclusive upon defendant, a grantee from Samuel H. Thatcher before the judgment, either as to the amount of the debt, or as to the circumstances and character of the transaction out of which the indebtedness arose. The authorities upon this question are uniform and clear. I cite a few of them: *Hafner* v. *Irwin*, 4 Ired. 529; *Collinson* v. *Jackson*, 14 Fed. Rep. 309; *Clark* v. *Anthony*, 31 Ark. 549; *King* v. *Tharp*, 26 Iowa, 283; *Esty* v. *Long*, 41 N. H. 103; *Bruggerman* v. *Hoerr*, 7 Minn. 337, (Gil. 264;) *Sargent* v. *Salmond*, 27 Me. 539; *Caswell* v. *Caswell*, 28 Me. 233; *Downs* v. *Fuller*, 2 Metc. 135; *Carter* v. *Bennett*, 4 Fla. 283; *Hall* v. *Hamlin*, 2 Watts, 355; *Warner* v. *Percy*, 22 Vt. 155; *Boutwell* v. *McClure*, 30 Vt. 676; *Ingals* v. *Brooks*, 29 Vt. 399; Freem. Judgm. § 336; Bump, Fraud. Conv. 558.

In the case of *Ingals* v. *Brooks* the facts were as follows: Israel Brooks conveyed all his lands to his son, Clark Brooks, and as part consideration therefor said Clark Brooks agreed to pay all the debts of his said father. Leafy Brooks, who had become the wife of Ingals, presented a claim against the father, Israel Brooks, against which the son, Clark Brooks, maintained he had a set-off. They compromised; Clark Brooks released his set-off, and Ingals and wife threw off half the amount of their claim. Ingals then went to the father, Israel Brooks, and got him to allow judgment to go against him for the other half of the claim, of which proceeding Clark Brooks had no notice. Ingals then levied execution under this judgment on the lands held by Clark Brooks, and sold the same, and in course of time got a sheriff's deed, and began his action in ejectment. The court uses the following language:

"The judgment, being altogether *inter alios*, and in express violation of the understanding of Clark when he surrendered the claim against Leafy, one of the plaintiffs, and paid one-half the amount of the note in money, in agreed satisfaction of the whole, would have no effect upon the defendant Clark. He is entitled to show that the note was paid before sued, or that the judgment was for other reasons fraudulent to him. *Atkinson* v. *Allen*, 12 Vt. 619. This compromise of the note by Clark was just as effective a bar to the claim in law, and just as effective a release of his undertaking to pay it at the time of the conveyance, as if he had paid all the money upon it. It is true, he did undertake or promise to pay off the debts of the grantor, his father; and he has in fact paid them all, except the mortgage, which is not in question; and the judgment against Israel, the father, is either a subsequent debt founded exclusively on his promise to pay what they did not get of Clark, and which in no sense, under the circumstances, can be regarded as forming any part of the debts which Clark was to pay, or else the whole proceeding, so far as it is attempted to give it the appearance of a prior claim, is a fraud upon the compromise and settlement made with Clark, and the consequent surrender of the note; and in either case it will not enable the plaintiff to treat the conveyance as void, and levy upon it as the land of Israel Brooks. Judgment is reversed and the case remanded."

In the case of *Boutwell* v. *McClure*, the court used this language:

"The judgment upon the plaintiff's claim in this action, whether rendered before or after the claimant's appearance, concludes nothing on the question. In all such cases there is likely to exist the form of a contract of a date early enough to accomplish its purpose, and it is not uncommon that this contract assumes the more solemn form of contracts, such as that of a promissory note, or even a judgment of a court of record; but in either case they are of course only conclusive upon the parties under such contracts. Upon any question arising in regard to the creditor being *bona fide* such at a particular date, and continuing such to the present time, the contract is but *prima facie* evidence of the fact. It is always competent to impeach the debt, either as to its *bona fide* character, its date, or its continuance. For although the debt once existed, and at a date early enough to defeat the alleged fraudulent conveyance, yet, if it has been extinguished by payment on the part of the debtor, it sinks at once into the common mass of his assets, and cannot be subsequently kept on foot as the debt of a *bona fide* creditor."

The case of *Warner* v. *Percy* was an action in ejectment, and presents the identical question that is involved in the case at bar. Plaintiff claimed title under a warranty deed from Mr. Woodward, executed in February, 1842. The defendant claimed title under a deed from L. E. Pelton, executed February 3, 1847, and Pelton got title by means of a judgment, execution, levy, sale, and sheriff's deed, and secured possession of the premises. The plaintiff, who was grantee in the alleged fraudulent conveyance, brought his action in ejectment. The plaintiff, under objection from defendant, was permitted to give evidence tending to prove that at the time of the conveyance by Woodward, his grantor, to the plaintiff, he, Woodward, had claims to a considerable amount (in the language of the exceptions) against Pelton for property delivered to him, and for services rendered him; "and the question," says the court, "is now presented for our decision, whether such evidence was admissible for the purpose for which it was received by the county court. It was an important point on the part of the defense to show the motive which induced Woodward to execute the deed to the plaintiff. Was it done with the intention to defraud Pelton? We agree with the county court that if Woodward had, or supposed that he had legal claims against Pelton sufficient to meet whatever Pelton had against him, it has a decided tendency to rebut any presumption of a fraudulent intent in Woodward to avoid the rights of Pelton. The reason must be obvious. The mutual claims might be made the subject of a set-off, and by these means be mutually concluded. We also agree with the county court that this was proper evidence on the question whether Woodward was really indebted to Pelton at the time when the plaintiff received her deed,—that is, in such a sense that Woodward could by a fraudulent conveyance avoid any substantial right of Pelton. The plaintiff is not concluded by the judgment against her grantor, especially as it is subsequent to her deed. As between Pelton and Woodward, the judgment is conclusive so far as relates to Pelton's title under his levy. But so far as the plaintiff is concerned, how far back the indebtedness extends, and what was the relation, the relative state of the mutual claims of the parties to the judgment must be open to inquiry. We see no possible objection to any part of the charge of the court. The charge gives Pelton the right to levy on

this property, provided the conveyance was made to the plaintiff in fraud of any of Woodward's creditors; and we think it is favorable to Pelton as anyone could claim it should have been. The judgment of the court is affirmed." This opinion was delivered by REDFIELD, C. J.

In the case of *Sargent* v. *Salmond*, it appeared that the plaintiff had taken judgment against his debtor for twice as much as he was entitled to. Upon this fact the court refused to give him any relief as against the alleged fraudulent conveyance of his debtor, on the ground that he who comes into equity must come in with clean hands.

In the case of *Bruggerman* v. *Hoerr*, it appeared that the judgment was rendered upon a debt which was in fact void as against public policy, and for that reason the court refused to interfere with an alleged fraudulent conveyance.

These various authorities make it clear, not only that the judgment against Samuel H. Thatcher is not conclusive upon the defendant as to the amount of indebtedness, but also that it is the duty of this court sitting as a court of equity to inquire into the circumstances out of which such indebtedness is claimed to have arisen, and if those circumstances do not show that the claim is one which in equity and good conscience ought to be enforced, the court will not inquire into the transaction between the judgment debtor and the defendant, but leave the parties where their legal titles have placed them.

Now, it is a familiar doctrine of courts of equity that where a contract appears extortionate and unconscionable, it will not be enforced; so, where a complainant is seeking to obtain some unfair and unjust advantage, or, having been fully compensated for his time and labor and money, is seeking by technical rules and legal proceedings to grasp more, and wherever generally it would be inequitable so to do, a court of equity will refuse him any relief. See among other cases, *Kelley* v. *Caplice*, 23 Kan. 474, which by the way was an action at law; also, *Brown* v. *Hall*, 14 R. I. 249, and cases cited therein; *Butler* v. *Duncan*, 47 Mich. 94, 10 N. W. Rep. 123; *Sime* v. *Norris*, 8 Phila. 84; *Earl of Aylesford* v. *Morris*, L. R. 8 Ch. 484.

Now, in the first place, this land was appropriated to the payment of the Kaucher judgment, which was a prior debt of Samuel H. Thatcher. Whether the lien of that judgment was gone or not, the land was in fact sold upon that judgment, and bid in by defendant. Whatever may have been the motives of the two brothers, or by which one in fact the money to pay for the land was advanced, the land was sold, the money was advanced by one or the other, and the defendant became the purchaser. As the land thus went to pay a prior debt of the judgment debtor, complainant should have a very clear case for equitable interposition before it should be taken from the defendant and applied to the payment of another debt of his brother.

Again, 5 per cent. per month is outrageous interest. It may be legal if the statute places no limitations upon the contracting powers of parties; but is it equitable? Here Zella Glenmore, the borrower, was a woman so situated that she could not go into the money market and

borrow on the same terms as others.    Taking advantage of her situation, complainant exacts from her this enormous interest, besides demanding a bonus of $300 on the ground of services in enabling her to purchase the property, and then, as soon, if not sooner, than the debt matured, sweeps the property off to a public auction-house, where, as every one knows it would be, it was sold at enormous sacrifice; so that this property, which at the time the loan was made is shown to have been worth $6,000, realizes only one-fourth that sum.    Before doing this he has, according to his own testimony, received about one-third of his money back, and according to hers more than one half.    Not content with that, he appropriates 320 acres of the debtor's land, and then, by attachment proceedings and sale, and with a singular and suspicious omission in the advertisement, obtains the title to a note fully secured, amounting, with interest, to more than half of the original loan, and, enforcing thereafter the trust deed, is now the owner of most valuable property.    Has he not been paid in full, and more than full, for his original loan, and interest reasonable and unreasonable?    May not a court of equity now stay his hands, and say, "Enough?"    To grant to him the relief he now asks would be putting a court of equity and good conscience in the position of giving to him an unconscionable profit upon an extortionate contract. I do not think that should be done.    I have thus far considered this case solely from the standpoint of the complainant's rights, and have not noticed the circumstances of the transaction as between the two brothers; nor is it necessary, in view of the conclusion reached upon the former branch of the case, to comment on the latter.

For the reasons indicated a decree must go dismissing the bill.