ANDERSON v. HULTBERG.

(Circuit Court of Appeals, Eighth Circuit. January 7, 1918.)

No. 4837.

1. CREDITORS' SUIT ☜42—RIGHT TO MAINTAIN.

It is indispensable to the maintenance of a creditors' bill to avoid, as in fraud of his creditors, conveyances made or caused by a debtor before the judgment on which the creditors' suit is founded was rendered against the debtor, that the complainant show the existence, at the times the conveyances were made, of the trust, the indebtedness, or the actual fraudulent intent of the judgment debtor on which complainant relies.

2. JUDGMENT ☜708—CONCLUSIVENESS—EVIDENCE.

Where, after a conveyance, judgment is rendered against the grantor, in a suit to which the grantee is not a party, such judgment will estop the grantee from denying that the judgment was rendered at the time specified in its record, and that the grantor was then indebted to the judgment creditor, but it estops the grantee no further, and neither the judgment, nor the record of the action or proceedings on which it is based, is proof or competent evidence against the grantee, of a trust, or an indebtedness of the grantor, or of his intent to defraud his creditors, at the time the conveyance was made, nor of the circumstances or character of the transaction out of which the adjudged indebtedness arose, nor of any of the facts at issue between the grantor and his judgment creditor.

3. EVIDENCE ☜578—FORMER PROCEEDING—ADMISSIBILITY.

Complainant's assignor claimed mining property acquired by defendant's husband, which claim defendant's husband repudiated. Meanwhile he not only agreed to transfer to defendant certain other mining property, but paid the consideration for parcels of land which were conveyed to her. Thereafter the husband and complainant entered into an agreement for arbitration of their dispute. To this agreement defendant was not a party, nor was she a party to the suit on the award in favor of complainant. *Held* that, in a creditors' suit in federal court by complainant to set aside the conveyances to defendant, evidence received by the arbitrators and in the suit on the award was not admissible, except as offered by defendant or received under stipulation; this being particularly true in view of the strict rules in the federal courts as to the admission of testimony of witnesses at former trials and the fact that defendant was not even a party to the proceedings.

4. EVIDENCE ☜248(6)—ADMISSIONS—ADMISSIONS AGAINST INTEREST.

In such case, statements or admissions by defendant's husband, made after execution and recordation of the conveyances to her, are inadmissible to impeach her title, for declarations by a grantor after his conveyance are inadmissible to attack the title of the grantee.

5. COURTS ☜406(1)—CIRCUIT COURT OF APPEALS—EQUITY CASES—NEW TRIAL.

An appeal in an equity case in the federal courts is heard de novo by the Circuit Court of Appeals; consequently incompetent evidence, which the trial court itself stated would be disregarded, the court receiving the testimony without determining in the first instance its competency or relevancy, must be disregarded on appeal.

6. TRUSTS ☜72—RESULTING TRUSTS—STATUTES.

Under Gen. St. Kan. 1909, §§ 9699, 9700, declaring that when a conveyance for a valuable consideration is made to one person, and the consideration is paid by another, no use or trust shall result in favor of the latter, and title shall vest in the former, but that every such conveyance shall be deemed fraudulent as against the creditors of the person paying

the consideration therefor, and that when a fraudulent intent is not disproved a trust shall result in favor of creditors to the extent of their just demands, and also in favor of subsequent creditors, if there be sufficient evidence of a fraudulent intent, no resulting trust arises where the title to Kansas land is taken in the name of one party, another paying the consideration, unless it be established that the case falls within one of the exceptions of the statute.

7. TRUSTS ☞372(3)—ACTIONS—EVIDENCE—SUFFICIENCY.

In a creditors' suit, wherein the title of defendant to Kansas land was attacked on the ground that the property was paid for with moneys obtained from a mining claim, which defendant's husband, who paid the consideration, held in trust for complainant's assignor, evidence *held* insufficient to establish any trust.

8. FRAUDULENT CONVEYANCES ☞296—EVIDENCE—SUFFICIENCY.

In a creditors' suit, wherein defendant's title to Kansas lands, the consideration for which was paid by her husband, was attacked, evidence *held* insufficient to show that complainant's assignor was a creditor of the husband when the land was paid for, or that the payments for the land disabled the husband from discharging any such debts.

9. FRAUDULENT CONVEYANCES ☞298(3)—EVIDENCE—SUFFICIENCY.

In a creditors' suit, wherein defendant's title to Kansas land, the consideration for which was paid by her husband, was attacked, evidence *held* insufficient to show that the husband caused title to the land to be conveyed to the defendant wife, with actual intent to hinder, delay, or defraud his present or subsequent creditors.

10. FRAUDULENT CONVEYANCES ☞299(12)—EVIDENCE—SUFFICIENCY.

In a creditors' suit, wherein defendant's title to Kansas land, the consideration for which was paid by her husband, was attacked, evidence *held* insufficient to show that defendant did not receive and hold title for her own benefit, or that she held title for her husband as the real owner.

11. CREDITORS' SUIT ☞50—RELIEF—RECEIVERS.

Where, in a creditors' suit, receivers were appointed to take charge of the rents and profits of the land involved, defendant is, on denial of complainant's claim, entitled in such suit to an accounting of the rents and profits taken by the receivers.

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Creditors' bill by Nels O. Hultberg against Friedborg A. Anderson. From a decree for complainant, defendant appeals. Reversed and remanded.

Axel Chytraus, of Chicago, Ill., and Charles Blood Smith, of Topeka, Kan. (John J. Healy and E. Allen Frost, both of Chicago, Ill., on the brief), for appellant.

Harris F. Williams, of Chicago, Ill., and David Ritchie, of Salina, Kan. (John Barton Payne, Silas H. Strawn, and Walter H. Jacobs, all of Chicago, Ill., on the brief), for appellee.

Before SANBORN and CARLAND, Circuit Judges, and BOOTH, District Judge.

SANBORN, Circuit Judge. On September 7, 1907, the plaintiff below, Nels O. Hultberg, filed a creditors' bill against Mrs. Friedborg A. Anderson, the wife of Peter H. Anderson, founded on a judgment in favor of Hultberg and against Anderson for $264,708, rendered by the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

District Court of Dickinson county, Kan., on January 31, 1907, and upon executions thereon returned nulla bona, to avoid a deed to Mrs. Anderson made by the Northwestern Mutual Life Insurance Company for $12,500, dated December 26, 1899, recorded January 8, 1900, of land in Kansas called the Hafner farm, and a deed to Mrs. Anderson made by Gustaf A. Alstrom for $6,000, dated April 1, 1901, and recorded April 15, 1901, of land in Kansas called the Alstrom farm, and to subject these lands to the payment of the judgment against Anderson on the grounds (1) that Anderson bought these lands, caused them to be conveyed to his wife, and paid for them with the proceeds of a mining claim that he held in trust for Hultberg's assignor; (2) that Anderson bought and paid for the lands, and caused them to be conveyed to his wife, when he was indebted to the assignor of Hultberg for the proceeds of the mine and was insolvent, with the intent and purpose to defraud his creditors; (3) that he bought and paid for the lands, and caused them to be conveyed to his wife, with actual intent to hinder, delay, and defraud his creditors; and (4) that he caused the lands to be conveyed to Mrs. Anderson for himself and for his benefit, and that she has since held them in trust for him, and he has ever since been and still is the real owner thereof. Mrs. Anderson by her answer denied all the equities alleged in the bill, evidence was taken, there was a final hearing, and the court below rendered a decree for the plaintiff, Hultberg, on the ground that Anderson paid for the land with the proceeds of the mine, which he held in trust for the assignor of Hultberg.

Mrs. Anderson has appealed, and her appeal presents two questions: First, were the judgment against Anderson in the Kansas court, and an award and decree in Illinois on which that judgment was based, and the evidence or testimony in those cases, to none of which Mrs. Anderson was a party, or any of them, competent evidence against her of any of the essential facts requisite to establish the claim of Hultberg against her, except the fact that the Kansas judgment was rendered, and that at the time of its rendition, January 31, 1907, Anderson was indebted to Hultberg in the amount of $264,708; and, second, was the decree below sustained by sufficient competent evidence upon the merits of the issues?

A brief statement of the facts that are conceded or conclusively established and a short history of pertinent proceedings anterior to the Kansas judgment will render the discussion and decision of these questions more intelligible. In 1897 the Swedish Evangelical Mission Covenant of America, a corporation of Illinois organized for religious purposes and not for pecuniary profit, having its principal place of business in Chicago, was maintaining Hultberg at Chinik, in Alaska, as a missionary, and it sent Anderson, who had been a student with it in Chicago, to the same place as an assistant missionary and school-teacher, and paid his expenses of travel and a salary of $700 in goods a year. In the year 1898 gold was discovered near Chinik. In October of that year R. L. Price duly located, gave, filed, and recorded notice of location, and became the owner of placer claim No. 9 Above on Anvil Creek. On November 17, 1898, Price, for a recited consideration of

$20, which was paid to the attorney in fact of the grantor by Peter H. Anderson, conveyed this claim to him. In the summer of 1899 Anderson extracted from this claim gold from which he derived a net income of $40,000, and from placer claim No. 2 Above on Anvil Creek, which he also owned, gold from which he derived a net income of $18,000. In the summer of 1900 Anderson extracted from the claim No. 9 a net income of about $175,000. In 1900 the Covenant made a claim that Anderson had acquired and held No. 9 and its proceeds in trust for it, but it never claimed that he so held No. 2 Above, but admitted that he was the owner of that claim, although it was originally located in his name in the autumn of 1898. Anderson denied that he had acquired or held No. 9 or its proceeds in trust for the Covenant, denied that it ever had any interest in it, and continued to work the mine himself, or by a California corporation which he controlled, until the year 1903, when Claes W. Johnson and the White Star Mining Company of Illinois secured from Anderson, or from his California corporation, a contract of purchase and went into possession thereof. Thereafter, and in the year 1903, the Covenant, for a recited consideration of $1, conveyed all its title and interest in No. 9 and in its proceeds, and all its claims against Anderson, to the plaintiff, Hultberg. In the same year Hultberg and Anderson made a written agreement to submit to three arbitrators all the claims of Hultberg, as successor of the Covenant, against Anderson, and all the latter's defenses and contentions, and to abide and perform the award of these arbitrators. The White Star Mining Company and Claes W. Johnson were parties to this agreement, but Mrs. Anderson was not. Much evidence and the testimony of many witnesses was introduced before the arbitrators, and their award, made on April 13, 1904, was that Hultberg was entitled to recover of Anderson $232,200, to be paid by him immediately. Thereafter, in a suit in the circuit court of Cook county, Ill., to which Hultberg, Anderson, and others were parties, a decree was rendered on June 13, 1904, whereby the court adjudged that the award was valid, and that Anderson pay to Hultberg $232,200 and interest from April 13, 1904. This decree is the cause of action, and the only cause of action, upon which the judgment of the Kansas court of $264,708, against Anderson, which was rendered January 31, 1907, was founded.

At the final hearing before the court below counsel invoked, and now in this court counsel for the plaintiff, Hultberg, invoke, the award, the decree of the Illinois court, the testimony of stenographers that certain witnesses testified to certain facts before the arbitrators, and the testimony of witnesses to statements of Anderson derogatory to the title of Mrs. Anderson to the land in controversy, which were made long after the deeds were delivered to Mrs. Anderson and recorded, as evidence against her that Anderson held claim No. 9 Above and its proceeds in trust for the Covenant at the time her deeds were made, that he was then indebted to the Covenant, that he paid for the land with moneys he held in trust for the Covenant, that the land was bought and conveyed to her by Anderson with intent to hinder, delay, and defraud his creditors, and that she has always held the land in trust for Anderson, and it has always been really his. The court below

seems to have held that such evidence was competent to prove that Anderson held claim No. 9 and its proceeds in trust for the Covenant.

[1] But it was indispensable to the maintenance of the plaintiff's suit that he should clearly prove that at the times the deeds to Mrs. Anderson were made in December, 1899, and April, 1901, not on January 31, 1907, when the Kansas judgment on which his suit is founded was rendered, Anderson held the title and the proceeds of claim No. 9 in trust for the Covenant, or that at those times he was indebted to the Covenant, and his payment for the lands deeded to Mrs. Anderson deprived him of the means to pay his just debts then existing, or that he bought the lands and caused them to be conveyed to his wife with the actual intent to hinder, delay, or defraud his creditors, or that she has always held them in trust for him and they have been really his. It is indispensable to the maintenance of a suit on a creditors' bill to avoid conveyances made or caused by the debtor before the judgment on which the creditors' suit is founded was rendered against the grantor as in fraud of the latter's creditors that the plaintiff prove the existence, at the times the conveyances were respectively made, of the trust, the indebtedness, or the actual fraudulent intent of the judgment debtor on which the plaintiff relies. Horbach v. Hill, 112 U. S. 144, 149, 5 Sup. Ct. 81, 28 L. Ed. 670; Bruggerman v. Hoerr, 7 Minn. 337, 343 (Gil. 264–269), 82 Am. Dec. 97; Burton v. Platter, 53 Fed. 901, 906, 907, 4 C. C. A. 95, 100, 101; Tunison v. Chamblin, 88 Ill. 378, 385; Mattingly v. Nye, 8 Wall. 370, 373, 375, 19 L. Ed. 380; Clark v. Killian, 103 U. S. 766, 768, 769, 26 L. Ed. 607.

[2] The subsequent judgment against the debtor in an action to which the prior grantee was not a party or privy estops the grantee from denying that the judgment was rendered at the time specified in its record and that the grantor was at that time indebted to the judgment creditor in the amount therein stated, but it estops him no farther. Because such a prior grantee is not a party or privy to the subsequent judgment against his grantor in an action commenced after the grants were made, as in this case, and because "no grantee can be bound by any judgment in an action commenced against his grantor subsequent to the grant, otherwise a man having no interest in property could defeat the estate of the true owner" (Dull v. Blackman, 169 U. S. 243, 248, 18 Sup. Ct. 333, 42 L. Ed. 733; Freeman on Judgments [1st Ed.] § 162), neither the judgment nor the record of the action or proceedings on which the judgment is based is either proof or competent evidence against the grantee of the existence of a trust, of an indebtedness of the grantor or of his intent to defraud his creditors at the time the prior conveyance was made, nor of the circumstances or character of the transaction out of which the adjudged indebtedness arose, nor of any of the facts at issue between the grantor and his judgment debtor, nor of any adjudication or fact disclosed in the proceedings for that judgment, except the fact of the rendition of the judgment and of the indebtedness of the grantor to the judgment creditor at the time of the rendition of the judgment to the amount therein stated (Mattingly v. Nye, 8 Wall. 370, 373, 375, 19 L. Ed. 380; Dull v. Blackman, 169 U. S. 243, 248, 18 Sup. Ct. 333,

42 L. Ed. 733; Gottlieb v. Thatcher [C. C.] 34 Fed. 435, 438; Burton v. Platter, 53 Fed. 901, 906, 907, 4 C. C. A. 95; Lynch v. Burt, 132 Fed. 417, 428; Harrington v. Wadsworth, 63 N. H. 400, 401; Bruggerman v. Hoerr, 7 Minn. 337, 343 [Gil. 264–269], 82 Am. Dec. 97; Corser v. Kindred, 40 Minn. 467, 468, 42 N. W. 297; Minnesota Debenture Co. v. Johnson, 94 Minn. 150, 152, 102 N. W. 381, 110 Am. St. Rep. 354; Yeend v. Weeks, 104 Ala. 331, 338, 16 South. 165, 166, 167, 53 Am. St. Rep. 50; Sweet v. Dean, 43 Ill. App. 650; Coles v. Allen Preer & Illges, 64 Ala. 98; Taylor v. Means, 73 Ala. 468).

[3] For the same and still stronger reasons neither the award of the arbitrators, nor the judgment against Anderson thereon in the Illinois court, nor any decision which that court or the abitrators made, nor the records of those proceedings, nor the testimony of witnesses in the hearing before the arbitrators, nor the admissions or statements of Anderson after the deeds were made, were competent evidence against Mrs. Anderson, except in those instances in which she and her attorneys in this case stipulated that they should be considered in evidence or themselves offered them in evidence. All those proceedings were commenced years after Mrs. Anderson received her deeds and recorded them. She was not a party or a privy to any of them. They were all founded on the agreement of arbitration which Hultberg and Anderson signed. Mrs. Anderson never signed it or took any part in the proceedings under it and none of those proceedings to whose introduction in evidence in this case she did not consent are more competent evidence against her upon any issue in this case than they would be against any other stranger. They were res inter alios acta, and had no effect upon her rights. The testimony of stenographers or other witnesses to what Anderson or any other witnesses testified before the abitrators was incompetent, because she had never agreed to the arbitration, or to the taking of any testimony before the arbitrators, the court, or the examiners appointed in the arbitration proceeding. Because she had no opportunity to cross-examine the witnesses, or to produce evidence to rebut their testimony, the testimony of witnesses at a former trial of the same cause between the same parties is inadmissible upon a second trial between them in the federal courts. Ex parte Fisk, 113 U. S. 713, 722, 725, 5 Sup. Ct. 724, 28 L. Ed. 1117; Whitford v. Clark County, 119 U. S. 522, 525, 7 Sup. Ct. 306, 30 L. Ed. 500; Beardsley v. Littell, Fed. Cas. No. 1185; Salt Lake City v. Smith, 104 Fed. 457, 469, 43 C. C. A. 637, 649. Much more is the testimony of witnesses at a former trial of the same issues in a suit or proceeding to which the objector was neither a party nor a privy.

[4] Nor is the testimony that crept into this case of the statements or admissions of the grantor, Anderson, derogatory to the title of Mrs. Anderson, which were made many months after her deeds were delivered and recorded, competent evidence to impeach her title. Declarations or admissions of a party who has never had, or has had and has conveyed, or has caused the title to property to be conveyed, made subsequent to the conveyance, and which were not a part of the things done at the time of the transaction, are inadmissible to assail

the title of the grantee. Burt v. McKinstry, 4 Minn. 204, 207 (Gil. 146, 149), 77 Am. Dec. 507; Derby v. Gallup, 5 Minn. 119 (Gil. 85, 97); Zimmerman v. Lamb, 7 Minn. 421, 423 (Gil. 336, 338).

[5] The result is that in the consideration and determination of this case in this court all the incompetent evidence to which reference has been made must be disregarded, for the court below stated in the course of the hearing before it that it admitted evidence offered without determining its competency or relevancy, but that it should not consider or give weight in the decision of the case to evidence thus admitted which it deemed incompetent or irrelevant. An appeal in a suit in equity in the national courts invokes a new hearing and decision of the case on its merits, and accordingly the incompetent evidence to which reference has been made must be disregarded in this court, and the case must be considered and decided upon the competent and relevant evidence in the case only.

[6] That evidence leaves no doubt that Anderson bought and paid for the farms and caused them to be conveyed to his wife. She testified that he paid for them out of the proceeds of placer claim No. 2, which it is conceded that he owned for his own benefit, and which she testified he had previously given to her. In the view which this court takes of this case, it is, however, not material in the state of the evidence whether he paid for the lands with his own money or with hers. For the statutes of Kansas declare that, when a conveyance for a valuable consideration is made to one person and the consideration is paid by another, no use or trust shall result in favor of the latter, but the title shall vest in the former, although every such conveyance shall be presumed fraudulent as against the creditors of the person paying the consideration therefor, and that when a fraudulent intent is not disproved a trust shall result in favor of prior creditors to the extent of their just demands, and also in favor of subsequent creditors, if there be sufficient evidence of a fraudulent intent. General Statutes of Kansas 1909, §§ 9699, 9700. The deeds to Mrs. Anderson are therefore presumptively valid and impregnable to the attack of the plaintiff, unless he has proved by substantial and convincing competent evidence either (1) that they were paid for with funds held by Anderson in trust for the Covenant, or (2) that the Covenant was a creditor of Anderson at the times the payments for them were made, and that those payments made him unable to pay the just debts he then owed, or (3) that he then had the actual intent to hinder, delay, and defraud his creditors by the purchase and payment for these lands, or (4) that he placed the title to these lands in the name of Mrs. Anderson, and she received and held it, not for the benefit of herself, but for his benefit, and that he has ever since been and is the real owner of these lands.

[7] Does the competent evidence in this case establish the fact that in December, 1899, when the Hafner deed to Mrs. Anderson was made and paid for, or in April, 1901, when the Alstrom deed was made and paid for, Anderson held placer claim No. 9 Above, or the proceeds thereof, in trust for the Covenant? The records and writings which vested the legal title under which the Covenant claims An-

derson held as trustee for it disclose the facts that this claim No. 9 was discovered and located on October 18, 1898, by R. L. Price, by G. W. Price, his attorney in fact, and that on November 17, 1898, R. L. Price, by G. W. Price, his attorney in fact, sold and conveyed it by a mining deed dated on that day to Peter H. Anderson. Anderson is not named as trustee, nor is the Covenant named in this deed, or in any of the writings relating to the title. The testimony establishes the fact that Hultberg was the missionary of the Covenant at Chinik in 1897 and 1898, that Anderson was his assistant and the teacher of the school, that for their services the Covenant paid their expenses and $1,100 worth of goods per annum to Hultberg and $700 worth of goods per annum to Anderson, and that they were permitted to use and dispose of these goods as they saw fit. Anderson boarded with Hultberg until August 31, 1898, when Hultberg and his family left Alaska, and he did not return until the next summer.

The competent testimony in this case, upon which alone reliance may be placed as tending to show that Anderson held this claim in trust for the Covenant, is this: Mr. Elliott testified that in June, 1899, Anderson told him that claim No. 9 had been staked and recorded by Eskimos, but it had been held that they could not hold claims, and then he was appointed at his own suggestion as trustee for the Eskimos and the Covenant to take the claim; that he asked Anderson in June, 1899, to loan him some money, and Anderson said he had no money of his own, but that he had some of the Covenant's money, and that he then loaned him $25; that from 1897 to 1904 Anderson was mining; that he, Elliott, worked part of claim No. 9 under a lease from Anderson as agent for the Covenant, but that the lease did not say as agent, but Anderson told him so. If the claim had been staked and recorded by Eskimos, and Anderson had become the trustee of the supposed title resulting from those facts, that title and that alleged trusteeship must have been superseded and made void, for the only title established by the evidence is that in Anderson the individual, derived from the location of Price in the fall of 1898. If Anderson had no money of his own in June, 1899, that is no evidence that he did not own the $20 which Price testified he paid him for claim No. 9 in November, 1898, for at that time he had been serving more than a year as a teacher and missionary, and had doubtless received for his salary more than $700 worth of goods, and Hultberg testified that he paid nothing for his board prior to August 31, 1898. Nor is the fact, if one has faith sufficient to believe that it was a fact, that Anderson told Elliott that he had made a lease of a part of No. 9 to him as agent for the Covenant worthy of serious consideration as evidence of Anderson's trusteeship, in the face of the fact that the written lease was made by Anderson the individual and not as trustee, and that he held the possession and took the proceeds of the claim under a perfect title in his individual self.

Hultberg testified that on August 24, 1897, Anderson told him that all he owned in the world was 27 cents. But that was more than a year before he bought claim No. 9 Above, and is not sufficient to raise even a suspicion that the $20 he paid for that claim in November, 1898, was not his own money.

Mrs. Frederickson testified that in the spring of 1899 Mrs. Anderson told her that she had received a letter from Anderson in which he wrote that he had found a claim out in Alaska for the Covenant, and that they could build schools and hospitals all they wanted to. But this testimony in no way identifies the claim which Anderson referred to in the letter with claim No. 9 Above, or with claim No. 2 Above, or with claim No. 1 on Rock Creek, all of which he owned, or with any of the thousands of other claims which he did not own. This and all the other competent evidence in this record has been thoughtfully compared and considered. But it is far from sufficient to overcome the record title in Anderson, the established fact that he paid for the deed of the property himself, that he might have obtained the $20 he paid for it from the proceeds of the goods that were shipped to him for his services, that he might have borrowed it, that there is no evidence that any of the moneys of the Covenant were used to make that payment, that no declaration of trust or writing of any kind made or signed by Anderson, admitting or indicating that he held the claim in trust for the Covenant, is produced, that his relation of employé of the Covenant to teach school and do missionary work for his expenses and a salary in goods did not deprive him of the right with the means he derived from his salary, or with borrowed money, to buy and own mines and other property for his own benefit, and did not charge any property he thus acquired with any trust for the benefit of the Covenant, that the Covenant was incorporated to spread the gospel, and not to speculate in mines, and Anderson was not its employé or agent for the latter purpose, and that he took possession of and worked the mine, claimed and took its proceeds for himself, and constantly and persistently denied that the Covenant had any interest in it as cestui que trust, or otherwise, throughout his relation to it. In the face of these facts the evidence that he held claim No. 9 or the proceeds of it in trust for the Covenant in December, 1899, or in April, 1901, when the deeds were made and paid for, not only utterly fails to prove such a trust, but it is so weak as to be almost negligible.

[8] Was the Covenant a creditor of Anderson when the deeds were paid for, and did those payments disable him from paying the debts he then owed? The only theory on which it is contended that the Covenant was Anderson's creditor is that he held claim No. 9 and the proceeds he had extracted from it prior to April 1, 1901, in trust for the Covenant, that he had not paid those proceeds over to it, and that he was therefore indebted to it for them. But as the plaintiff has utterly failed to prove the trust relation between him and Anderson, those proceeds were the property of Anderson, he was not indebted to the Covenant for them, the Covenant was not a creditor of Anderson, there was no evidence that he owed any other debts, and there was conclusive evidence that the proceeds which he had derived from the mines he owned, including No. 9 Above, amounted to more than $50,000 when he paid for the Hafner farm, and to more than $200,000 when he paid for the Alstrom farm. There was, therefore, no substantial evidence that the Covenant was a creditor of Anderson when he bought the lands and paid for the deeds.

[9] Did Anderson buy these farms, cause the title to them to be conveyed to his wife, and pay for them with the actual intent to hinder, delay, or defraud those whom he might subsequently cause to become his creditors after the deeds were made? Did he intend to hinder, delay, or defraud any of his creditors? There is no persuasive evidence that he had any such intent. There was no motive to induce such an intent. He owed no debts. He had tens of thousands of dollars. His mines were constantly producing large amounts, and promised to continue to do so. The claim of the Covenant that he held placer claim No. 9 Above and its proceeds in trust for it had not been placed in suit, had not gone beyond a fraternal religious claim and appeal to him, and he knew and insisted that the claim was unfounded. It is incredible that he then had any intent to purchase and pay for these lands and place the title in his wife to hinder, delay, or defraud any of his creditors prior or subsequent. The true explanation of the transaction is found in the testimony of Mrs. Anderson. She had become acquainted with Mr. Anderson in 1896 or 1897, when they were both studying or working for the Covenant in Chicago, and before Anderson went to Alaska. In the fall of 1899, after he had worked the mines that summer, he sent for her to come West and she went to Seattle, Wash., to meet him when he came down from Alaska that autumn, and they were married in San Francisco in November of that year. She was a young woman of frugal habits, accustomed to earn her own living. She testified that before her marriage, when Anderson and his Alaska friends came down to Seattle from Alaska, they were extremely extravagant; that they were pouring money left and forth; that she never saw anything like it; that she told Anderson that he must be careful, or they would not have anything; that she simply did not like it a bit; that Anderson and his Alaska friends rented a whole palace car coming down from Seattle to San Francisco, and paid $9 only for a room at the Palace Hotel; that she was not brought up that way, and she did not like it; that she told him that he would have to change, or she would be unhappy; that she said to him, "You must give me something for my own self, or certainly I shall be unhappy. You have said No. 2 is not very rich, nor Rock Creek. Give me these two mines and let me have the proceeds, and I understand there is enough this year to buy me something that I can go back on if things go wrong with you—if you should invest wrong;" and that after more talk on that day, the day before their marriage, he gave her those mines and the proceeds of them, and that they were hers ever after. She also testified that the two farms were purchased with the proceeds from those two mines and that those proceeds were her money. So far as this story relates to the intent, purpose, and object of Anderson in buying these farms and placing the title in them in Mrs. Anderson, it rings true. It discloses that that intent and purpose was to buy Mrs. Anderson something that she could go back on if things went wrong with Anderson, or if he invested wrong. It may be conceded that he never conveyed the title to the two mines or their proceeds to Mrs. Anderson, and that the proceeds of those mines are not traced into the payments for the farms. It may even be conceded that Anderson paid

for them with his own money. He was in a position where he had the right, and it was perhaps his duty, to purchase these farms and have them conveyed to his wife, or to make some other like provision to secure her against his probable misfortune, and the evidence convinces that such was his object and intention in their purchase and conveyance, and that he had no intent to hinder, delay, or defraud any of his creditors either prior or subsequent.

[10] Finally, did Anderson place the title to the farms in the name of his wife, and did she receive and hold it, not for her benefit, but for his, and has he ever since been the real owner thereof? The competent evidence in support of an affirmative answer to this question is that John R. Anderson has occupied and farmed the Hafner farm ever since the year 1910, and has sent Peter H. Anderson one-half of the net proceeds of this farm and operation; that Albert E. Anderson, another brother of Peter H. Anderson, has occupied and farmed the Alstrom land ever since it was conveyed to Mrs. Anderson, and has paid Peter H. Anderson one-third of the proceeds of this farm and operation; and that on November 11, 1902, Mrs. Anderson made a written lease of 80 acres of the Hafner farm, in consideration of love and affection, to A. Anderson and Martha Anderson, the father and mother of Peter H. Anderson, until the decease of the last survivor of the lessees, for the purpose of furnishing a home for them during their natural lives. But Mrs. Anderson was not a business woman when she was married; the fact that her husband, who is accustomed to business transactions, collects the rents or income of his wife's property, does not convert it into his property or charge it with any trust in his favor. On the other hand, such a transaction charges the funds he collects with a trust in her favor, and, if he converts them to his own use, renders him her debtor to the amount that he converts, and in view of the record title in Mrs. Anderson during all the years since 1899 and 1901, in view of the position and relation of the parties when the deeds were made, the object and intent of Anderson in the purchase of these farms, to secure his wife against his possible misfortune, the conclusion is irresistible that these farms have been, ever since they were conveyed to her, the property of Mrs. Anderson, that they have never been and are not charged with any trust for her husband's benefit, or held by her for him or for his benefit, and that he has not had them, and is not now entitled in law or in equity thereto.

For the reasons which have now been stated, the plaintiff has failed to prove the alleged equities of his bill, and he is entitled to no relief against Mrs. Anderson, and she is entitled to a decree of dismissal of the bill on the merits and for her costs.

[11] There is an order in the record, made October 6, 1913, appointing a receiver to collect the rents and profits of the lands, and if that receiver has collected such rents or profits Mrs. Anderson is entitled to an accounting therefor and a recovery thereof in this suit. There may be other matters that should be determined by the decree, or by preliminary or supplementary orders.

Let the decree below be reversed, with costs against the appellee, and let this case be remanded to the court below for further proceedings not inconsistent with the views expressed in this opinion.