# DEWITT C. TUNISON

## *v.*

# TIBITHA C. CHAMBLIN *et al.*

1. ERROR—*granting of temporary injunction can not be assigned for error.* The granting of a temporary injunction in a cause can not be assigned for error.

2. CHANCERY—*proper evidence, only, considered.* In chancery cases, the court considers the proper evidence before it, and determines from that alone; and this court will presume that a decree is based upon such evidence, without regard to such as is improper or irrelevant.*

3. FRAUDULENT CONVEYANCE—*advancement by a debtor to his child.* Where a father is insolvent, he can not make an advancement to a minor son in fraud of his creditors. A debtor, while embarrassed and unable to pay his debts, can not give away his property to the injury of his creditors, and if he does so, it will be a fraud upon their rights, and they may reach it and subject it to the payment of their debts. In such a case, it is not necessary that the grantee shall consent to, or know, that the grantor intended to perpetrate a fraud, as he takes as a volunteer.

4. SAME—*when gift is void—pre-existing and subsequent creditors.* Where a father, in failing circumstances, enters land in his minor son's name, only creditors at the time such fraud is committed can avoid the conveyance, unless it be shown that the act was made in anticipation of incurring debts, to avoid the payment of which the conveyance was made.†

5. SAME—*presumption as to date of indebtedness.* Where an entry of lands by a father, in the name of his minor son, is sought to be avoided by creditors of the father, it will not be presumed that the debts existed at the time of the transaction, in the absence of proof to that effect.

6. DEED—*of minor.* Deeds made by a minor are not void, but only voidable. Their validity does not depend upon a ratification after the minor attains his majority, but to avoid them he must, by some act clear and unmistakable in its character, disaffirm their validity.

7. SAME—*what acts avoid minor's deed.* Notice by a person making a deed for land during minority, that he disaffirms the same, followed by acts of ownership, or such as indicate a claim of title as against the deed, such as posses-

---

*See, also, *Stone* v. *Wood,* 85 Ill. 603.

† Where the conveyance is colorable merely, and a secret trust and confidence exists for the benefit of the grantor, the conveyance will be held void both as against precedent and subsequent creditors. *Jones et al.* v. *King et al.* 86 Ill. 225, and cases there cited.

sion, suit to regain possession, or to cancel the deed, payment of taxes, selling or leasing, or offering to sell or lease, improving the premises, or such like acts, within a reasonable period after arriving at age, which, in analogy to the limitation in ejectment, after arriving at age, has been held by this court to be the limit of the time to disaffirm. Mere forgetfulness of having made a deed, for twelve years after attaining majority, will furnish no excuse for the delay in disaffirming a deed made during minority.

8. SAME—*presumption as to delivery.* Where a deed, duly executed, is found in the hands of the grantee, there is a strong implication that it has been delivered, and only clear and convincing evidence can overcome the presumption. The unsupported evidence of the grantor, some fifteen or twenty years after the date of the deed, can not be received to rebut such presumption.

9. SAME—*evidence to overcome certificate of acknowledgment.* The certificate of the acknowledgment of a deed imports verity, and can not be overcome, except by clear and satisfactory evidence. The evidence of the grantor denying the execution of the deed, and the opinion of experts that the signature thereto is not that of the grantor, are not sufficient.*

10. SAME—*certificate of acknowledgment as evidence on question of forgery.* The law has made a certificate of the acknowledgment of a deed evidence of the execution of the deed by the party purporting to have acknowledged it, and, although not conclusive, it can be overcome only by clear and undoubted evidence. Proof that the signature is not in the handwriting of the grantor, falls far short of showing it to be a forgery. By acknowledging, the party adopts the signature and makes it his own.

11. SAME—*consideration.* Although no money is paid for a deed for land, yet, if it is given in payment or to secure an indebtedness of the grantee's father, this will be ample consideration to support it and to pass the legal title.

12. NOTICE—*of title, by possession.* The possession of land under a conveyance is notice to a subsequent purchaser of the prior grantee's title, and if such subsequent purchaser takes possession, a court of equity will cancel his deed as a cloud on the title of the prior grantee, and restore the possession to him or to his heirs.

---

* Of evidence to overcome the officer's certificate of acknowledgment, see *Crane* v. *Crane et al.* 81 Ill. 165; *Lowell et al.* v. *Wren,* 80 id. 238; *Marston et al.* v. *Brittenham,* 76 id. 611; *Russell* v. *Baptist Theological Union,* 73 id. 337; *Kerr* v. *Russell,* 69 id. 666; *Calumet and Chicago Canal and Dock Co.* v. *Russell,* 68 id. 426; *Lickmon, Exr.* v. *Harding,* 65 id. 505; *Spurgin* v. *Traub et al.* ibid. 170; *Monroe* v. *Poorman,* 62 id. 523. Upon what ground the certificate may be questioned: *Eyster* v. *Hathaway,* 50 Ill. 521; *Hill* v. *Bacon,* 43 id. 477; *Graham* v. *Anderson,* 42 id. 514, and cases there cited.

APPEAL from the Circuit Court of Sangamon county; the Hon. CHARLES S. ZANE, Judge, presiding.

Messrs. INGERSOLL & PUTERBAUGH, Mr. W. S. BUSH, and Messrs. DEARBORN & CAMPBELL, for the appellant.

Mr. E. A. WALLACE, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This record discloses the fact that the father of appellant, Tunison, in April, 1851, when the latter was about ten years of age, entered the land in controversy, at the United States land office, in the name of his son; that appellant executed a deed, first, to his father, on the 8th day of March, 1859; and a deed, claimed to have been a mortgage, which has been paid, to Mundy, on the 16th day of July, 1860. He also made another deed, to Chamblin, on the 1st of August, 1859, which is sought to be set aside, and a deed was made by Tunison to Chamblin, on the same date, and a deed from appellant to James H. Matheny, of the date of May 25, 1860; but it is claimed that this last deed is a forgery.

On the 16th day of July, 1860, William C. Tunison, the father of appellant, and Chamblin, submitted certain differences to two arbitrators, who found an award, in favor of Chamblin, for $1552.48; and Tunison, on the 20th of that month, executed a power of attorney to G. W. Shutt to confess a judgment in favor of Chamblin, "in any circuit court in Illinois, or any other court having jurisdiction in said State," for that sum, which was acknowledged before the county clerk of Sangamon county. On the next day, Shutt, under and by virtue of the power, confessed a judgment for that amount, in the circuit court of Cook county, and on the same day an execution was issued thereon, and sent to the sheriff of Mason county. He received it on the 31st of that month, and levied it on the land in question, with other lands, on the same day, and it was returned on the 15th day of March, 1866, satisfied by sale of the land. A certificate of

levy was filed, in the proper office, on the day the levy was made, and, also, a copy of the certificate of purchase on the 4th day of November, 1865. Chamblin became the purchaser under this sale on execution.

At the April term, 1859, of the Sangamon circuit court, Chamblin obtained another judgment against Tunison for $575.55, on which, within a year, an execution was issued, and returned no property found; but another execution was issued on the 21st of July, 1860, to the sheriff of Mason county, which was levied on the land in controversy on the 1st of the next August, and the land was sold under it, to Chamblin, on the 4th of December, 1865, and Chamblin procured deeds under these sales.

On the 14th day of January, 1865, complainant filed his bill, in the Mason circuit court, to have his deed to Chamblin set aside as a cloud on his title. As many as three amended bills were filed during the progress of this cause. Defendant answered each, and filed a cross-bill, alleging the purchase of the land from the father of complainant in August, 1859; that complainant, in March of that year, conveyed the land to his father; that the deed from the father to him has been lost; that, since the commencement of the suit, complainant had sold portions of the land to Brown and Case; and prays that his title be established; that Brown and Case be decreed to convey to him, and for the removal of clouds from the title of defendant. Answers were filed to the cross-bill.

A hearing was had in the court below on the bill, amended bills, answers thereto, the cross-bill and answers thereto, replications, exhibits and proofs, and the court below found that the father of Tunison, prior to and at the time the land was entered, was in embarrassed circumstances and insolvent, and, to be able to control the same, and for his own use and benefit, and not as a gift to his son, entered it in his name, and that he held the same in trust for his father, and not in his own right; and to reverse the decree complainant appeals.

It is urged that the court below erred in granting the tem-

porary injunction in the case. It has been so repeatedly held by this court that error can not be assigned on such an order, that the practice must be regarded as settled, and we must decline to further discuss the reasons for the rule.

It is also urged that the court below erred in the admission of improper evidence. This court will never, in a chancery proceeding, reverse for that reason, even where it is apparent on the face of the record. The court hears and determines the case upon the proper evidence before it; and whatever may be before it, we will presume the court only considered the legitimate evidence pertinent to the issues, and that the decree was based on it; and when the record is brought to this court, the case will be heard on the proper evidence contained in the certificate of the judge who tried the case, disregarding all irrelevant and improper testimony. This has been so repeatedly announced by this court that it must be held to be the settled practice. To object to such well settled questions of practice but incumbers the argument, and has no tendency to elucidate the real questions involved. The record in this case is voluminous, and contains much irrelevant evidence that greatly enhances the labor of separating the material from the foreign matter that should not have been brought into the case; but we shall give the conclusions at which we have arrived, as the result of a patient and attentive perusal of the proofs before the court below, on the hearing, without attempting to discuss in detail all the testimony or pointing out the irrelevant portions, but will be content to announce conclusions reached from the record.

After such a length of time, from the frailty of human memory, we can not expect exactness or minute details in the evidence of witnesses. Again, many persons who, no doubt, could have given important testimony in reference to the case are dead, and others have forgotten, occurrences that took place at the time; but the evidence of Cheeney, Williams, Gonnly, the deputy sheriff, Matheny, Tomlins, Hardin, Cogeshall and Odan, when all considered together, we think, clearly

shows that C. H. Tunison was, at the time he entered the land, very much embarrassed—was in failing circumstances, if not at the time insolvent; nor do we think their evidence of little weight, as it is clear, direct, and based on information they at the time had. They were, most of them, intimately acquainted with him and with his circumstances, and each testifies according to the extent of his knowledge and recollection.

The fact that Tunison, about that time, was procuring the entry of other lands by Williams, in his name, and taking bonds for conveyances, is strong evidence that he had no means with which to purchase and pay for them, or he would have entered them in his own name; but they were entered by Williams, with his own money, in his own name, and he held them as security for the money thus advanced, giving bonds for conveyances; and Williams, who entered the lands in his own name for Tunison, testifies that Tunison was hard run,—was considered as embarrassed; and he had business transactions with him in 1851 and 1852. This evidence is important as explaining his financial condition, as the money was evidently advanced, as a loan, at twenty per cent.

Cheeney testified that, in the spring and summer of the year 1851, Tunison was embarrassed; that there were executions against him, and he was keeping out of the way of officers; and whilst he did not know the fact, it was reported amongst his creditors that he was unable to pay his debts; that, about that time, Tunison was breaking prairie in Cass, and, he heard, in Mason county, "and could n't venture to bring his teams to Springfield," where he resided; that "from 1851 he was hard pressed, involved in law suits, and borrowed money wherever he could get it."

Gonnly, who was deputy sheriff, testified that he knew Tunison well from 1841 until his death; that he does not recollect the time, but it was about 1851 "he broke up;" that he was considered insolvent in 1851 and 1852; that, about the time Williams entered the land, " we understood he was broke up." This witness says Tunison was indebted to Lewis and

Johnson, and thinks the amount was large; that Lewis, Tunison & Johnson were indebted in St. Louis, and says the amount must have been large; that Tunison removed from Springfield in 1852 or 1853, and the time he was indebted was before he left.

Hardin, who resided in Mason county in 1851 and 1852, and was then sixteen or seventeen years of age, knows that Tunison broke prairie, in those years, in that county, and that in the year 1852, whilst thus engaged, his property, or a portion of it, was seized, under some kind of legal process, and a portion of it was smuggled and got out of the way; that, "after the seizure of his property in 1852, his reputation for solvency in Mason county was lost."

Cogeshall, who lived in Mason county in 1850 and 1851, and sold Tunison. some oxen in the former year, in the early part of the next year went to Springfield to collect a note of $80 or $90 Tunison owed him on the sale of the oxen, and was there informed he could not make the money.

The other witnesses gave testimony corroborating the evidence of these witnesses. The Tomlins testify to the statements of appellant, in which they say he admitted that his father was in debt, and, therefore, entered the land in his name; and Odan testifies to substantially the same admissions of appellant.

Opposed to this is the evidence of appellant's brother, mother, and Priest. The brother and mother testify that they knew Tunison had personal property, consisting of oxen, wagons, horses, plows, cows, etc., and that they think it was of considerable value, and that if he was embarrassed, they did not know of it. They also say he had a house and furniture in Springfield. This may all be true, and still Tunison have been insolvent. Appellant's brother was then but sixteen or seventeen years of age, and it is not probable his father would talk to him about his embarrassments and pecuniary difficulties, and many men never communicate to their wives anything in reference to their business affairs. From other evidence in the record, they are evidently mistaken as

to the value of the property and, we think, the amount he then held.

The witness Priest says the house in Springfield was not paid for, nor does he say whether the balance was large or small, and it may have been the amount of its value, or very near it. He enumerates personal property, which he values at about $1000. He gives it as his opinion that Tunison was solvent, and owed but few, little debts, which could have been collected of him. Tunison is shown, by record evidence, to have been very largely indebted in 1858 to 1861. It then seems to have been as much as $12,000 or more, and nearly the whole of it remains unpaid.

All this evidence considered, we are of opinion that Tunison was insolvent at the time this land was entered in the name of his son, and that he was then unable to make an advancement to him without defrauding his creditors. A person must be just before he is generous, or can make provision for his family or others. A debtor, as all know, can not, when embarrassed and unable to pay his debts, give away his property to the injury of his creditors, and if he does so, it will be held a fraud upon their rights, and they may reach it, and subject it to the payment of their claims. And if a debtor so places his money in real estate in the name of another, the property may be subjected to the payment of creditors thereby defrauded. Nor is it necessary, when the fraud is thus perpetrated, that the grantee shall consent to, or even know that the grantor intends to perpetrate the fraud. As he takes as a volunteer, it does not matter whether he intended to commit a fraud. However honest his intentions, having paid nothing for the property, he, in equity, can not hold it against creditors of his donor.

But it is the doctrine of this court, that only creditors having claims when the fraud is committed can avoid such conveyances, unless it be shown the deed was made in anticipation of incurring debts, to avoid the payment of which the conveyance was made. *Mixell* v. *Lutz*, 34 Ill. 382; *Moritz* v.

*Hoffman*, 35 id. 553; *Gridley* v. *Watson*, 53 id. 186; *Wooldridge* v. *Gage*, 68 id. 157; *Guffin* v. *First National Bank*, 74 id. 259. And their is no evidence in this record that Chamblin's debts were then in existence. For aught that appears, the debts, however large they may have been against Tunison when the entry was made, may all have been paid. We can not presume these debts then existed; on the contrary we presume, if they had, that fact would have been shown.

The original bill was filed on the 14th day of January, 1865, and only sought to set aside and cancel a deed executed by appellant to Chamblin, dated August 1, 1859, because, as he alleges, he never executed it, or if he did, and has forgotten it, he was at the time under twenty-one years of age. There is nothing in the original bill that impugns the deed made by appellant to his father, on the 8th of March, 1859. Nor does he refer to or question the validity of his deed to Matheny, or to the deed executed to his father in March, 1859. But in his third amended bill, filed the 3d of July, 1874, within but twenty-four days of twelve years after he arrived of age, he attacks the deed to Matheny as a forgery, and alleges he had never affirmed it. He admits the signing, sealing and acknowledging of the deed to his father, but denies that it was ever delivered, and alleges that he has never affirmed it.

Deeds made by a minor are not void but only voidable. Their validity does not depend on a ratification after the minor attains his age, but to avoid them he must by some act, clear and unmistakable in its character, disaffirm their validity. Notice that he disaffirms, followed by acts of ownership or such as indicate a claim of title against the conveyance intended to be disaffirmed, such as possession, suit to regain possession or to cancel the deed, payment of taxes, selling, leasing or offering to sell or lease, improving the premises, or such like acts, within a reasonable period after arriving at age, which, in analogy to bringing ejectment after arriving at age, has been held by this court to be the limit of the time to disaffirm. Here, appellant by bringing suit within three years

after arriving of age, disaffirmed his deed to Chamblin, but not his deeds to his father and to Matheny. A minor, on arriving at age, may, without doubt, disaffirm one of several deeds made during minority, avoiding it and leaving others to have legal effect as if made when of full age. So here, the only claim by the original bill was, that the deed to Chamblin was made when appellant was a minor, and asking to have it canceled, thereby virtually affirming those to his father and Matheny.

Nor does the fact that he may have forgotten that he executed the deed to Matheny, or that he delivered the deed to his father, excuse his non action. Equity would not regard mere forgetfulness twelve years after a minor reaches his majority, as any excuse for delay in disaffirming a deed made during minority. Titles must rest on a more secure basis. We are unable to see that appellant did any act by which these deeds were avoided, and, if genuine, then they were effectual to pass the title.

But it is urged, that the deed of appellant to his father never became operative, because it was never delivered. When a deed, duly executed, is found in the hands of a grantee, there is a strong implication that it has been delivered, and only clear and convincing evidence can overcome the presumption. Otherwise, titles could be easily defeated, and no one could be regarded as being secure in the ownership of land. It can not be that a grantor may assail a conveyance fifteen or twenty years after a deed has been made, and recover the land by merely swearing he never delivered the deed. The unsupported evidence of a grantor surely can not be permitted to have such effect, especially when the evidence of such a grantor is, in many material matters, contradicted, and who seems to act on a low moral plane. To so hold would render all titles insecure, and would be disastrous in the extreme. Any system of jurisprudence, adopting rules for the attainment of justice, can never sanction a rule fraught with such unjust and iniquitous results.

Here is a deed found in the hands of the grantee of appellant's father, which has every appearance of being regular and properly executed, and which enabled the father of appellant, who appeared to be the grantee, to sell the land to Chamblin, obtain his money, and thus perpetrate a fraud. Appellant admits the making of the deed, but. denies the delivery, leaving us to infer that his father wrongfully possessed himself of the instrument, and uttered it as genuine and valid, which would, if anything short of forgery, be equally as immoral and injurious in its consequences to Chamblin. Appellant does not charge this against the memory of his father, but gives no other plausible theory upon which it could have passed to the hands of Chamblin. Appellant has wholly failed to repel the presumption that this deed was delivered. And if delivered and never avoided, then it passed the title into his father, and it passed from him to Chamblin.

But conceding this deed was not delivered, then we think that there is no doubt that appellant did make, execute and deliver the deed for this land to Matheny. Matheny testifies that he wrote the deed to himself at the request of one or both of the parties, and it was taken to be executed, and was afterwards returned to him, signed and acknowledged, as he thinks by the father of appellant. If this is true, and the deed is a forgery, then the father uttered the forged instrument. But all of the attending circumstances repel the presumption; Matheny testifies to many transactions between the father and Chamblin, that render it more than probable that appellant did execute the deed. And the witness says this deed was a part of a transaction to secure Chamblin a large debt the elder Tunison owed him. And it is rendered the more probable, as appellant does not deny that he executed the deed to Mundy for a similar purpose, about that time. Again, there is nothing that renders it at all probable that the notary public, who certified to the acknowledgment, would join in perpetrating a forgery. His certificate imports verity, and can not be overcome but by clear and satisfactory evidence. And the evidence

of appellant, and the opinion of experts that the signature is not appellant's, are not sufficient.

The law has made the certificate of the acknowledging officer proof of the execution of the deed, and whilst it is not conclusive, public policy forbids that it should be overcome but by clear and undoubted evidence that it is a forgery. Although the proof should establish that the signature is not in the handwriting of appellant, that would fall far short of proving it a forgery. All know that a person may sign such instruments by another, and it becomes his signature by adoption. Suppose this deed was signed by some one else, either with or without authority, do not all know that when he took it to the officer and acknowledged it to be his signature, he thereby effectually made it his. Titles to real estate can never rest on such a frail tenure as to be defeated by proving there is a doubt whether the grantor's true signature is signed to a deed, properly acknowledged before an officer empowered to certify such acts. We think the evidence wholly fails to prove this deed to Matheny a forgery.

But, it is urged, that the deed was made without consideration. Although the grantee paid no money, there was a sufficient consideration, as it was given in payment or to secure large indebtedness, from appellant's father to Chamblin, and Matheny testifies that it was conveyed to him in trust for the latter. Such a consideration is ample to support the conveyance and to pass the legal title. And Matheny having conveyed by quitclaim deed to the heirs of Chamblin, whatever title he held passed to them. And even if it was conveyed as a security for the payment of $5000, loaned by Chamblin to appellant's father, the title could not be decreed from them without a redemption, and that is not sought; but the result of the effect of this deed is staked on its being a forgery, and appellant has failed to establish the fact.

If, then, the deed from appellant to his father was delivered, Chamblin acquired the title by the conveyance by the latter to him, as the former of these deeds was never avoided, and

that title has descended to the heirs of Chamblin by his death. But if it were conceded that deed was never delivered, and, consequently, never became effective to pass title, then the deed to Matheny was delivered, and has not been avoided, and the title passed from appellant to him, and from him to the heirs of Chamblin. So, in either event, they certainly hold the title and have the right to be assured of its possession and enjoyment as against appellant.

When Tunison conveyed to Brown and Case, he held no title legal or equitable. He had conveyed his legal title to Chamblin, and Chamblin was in possession, which was notice to the world of all he claimed. Having no title, and Brown and Case purchasing charged with notice that Tunison had conveyed to Chamblin, and had no title, they took nothing, and had no right to enter on Chamblin's possession, and having no title or right to possession, it is but equitable that they, being parties to the suit, should restore possession to the heirs of Chamblin, and their deed from Tunison be canceled as a cloud on their title. After a laborious and careful examination of this voluminous record, we have found no error for which the decree should be reversed, and it must be affirmed.

*Decree affirmed.*