THOMAS W. CHASE, in His Own Right, and THOMAS
W. CHASE, as Executor of Elizabeth Gray,
Late Elizabeth King,

*vs.*

GEORGE GREY.

*Fiduciary relations: burden of proof.*

Where a man marries a woman much older than himself,
weak in body and mind, childish and bordering on senile demen-
tia, and immediately her real estate is conveyed to him without
valuable consideration and her money transferred to his account,
the parties are in confidential relations, and such gifts should
not be upheld.                                                    p. 626

In such cases, the burden is upon the person taking the gift to
show that it was fair and proper.                                 p. 625

Under Section 3 of Article 35 of the Code, a surviving hus-
band who has received gifts and transfers of property from his
wife is not competent to testify as to transactions he had with
her or statements made by her respecting such gifts and trans-
fers.                                                             p. 626

*Decided June 25th, 1919.*

Appeal from the Circuit Court for Calvert County. (Bris-
coe, J.)

The facts are stated in the opinion of the Court.

The cause was argued before Boyd, C. J., Burke, Thomas,
Pattison, Urner, Stockbridge and Adkins, JJ.

*John B. Gray,* for the appellant.

*J. Briscoe Bunting,* for the appellee.

BURKE, J., delivered the opinion of the Court.

The appeal in this case was taken from a decree of the Circuit Court of Calvert County, dismissing upon final hearing, the bill of complaint. The bill was filed by Thomas W. Chase in his own right, and as the executor of Elizabeth Gray, deceased, for a decree requiring the appellee to pay over to the complainant the sum of $3,835.00, the money of said deceased, which she had on deposit in the Prince Frederick Bank of the Eastern Shore Trust Company, which he drew and used for his own benefit and individual purposes, and also for the discovery of all the personal property of said deceased which came into his hands at the time of and since his marriage to her. Under the last will and testament of Elizabeth Gray, dated the second day of August, 1916,—during the life of her second husband, Robert King,—she devised and bequeathed a farm, which she then owned, to her said husband for life or remarriage; and from and after his death or remarriage to her nephew, Thomas W. Chase, the complainant. All her personal estate, including all moneys deposited in bank and all securities, she bequeathed absolutely to her husband, Robert King, and Thomas W. Chase, equally to be divided between them. The testatrix died on the ninth day of January, 1918. The will was admitted to probate by the Orphans' Court for Calvert County, and letters testamentary were granted to the complainant.

The substance of the bill of complaint may be stated as follows: Elizabeth Gray, the testatrix, had been married three times. Her first husband was William Weems, and after his death she married Robert King. At the time of her marriage to him she owned the farm mentioned in her will, and had on deposit in the Prince Frederick Bank of the Eastern Shore Trust Company,—hereinafter referred to as the

bank,—about thirteen hundred and fifty-five dollars in cash, and also was possessed of personal property of considerable value. Robert King died on the fourteenth of September, 1916, and about two months thereafter she married George Gray, the appellee. At the time of her marriage to Gray she owned the farm mentioned and was possessed of personal property and had on deposit in the bank in cash the sum of thirteen hundred and thirty-five dollars. That George Gray married her solely for the purpose of obtaining her property, "he being forty-eight years of age while she was over seventy, and enfeebled in both body and mind, and not fully understanding what she was doing at the time of her marriage, or indeed at any time thereafter." That before the marriage took place the said Gray bargained to sell the farm for $2,500.00; that the purchaser of the farm and a notary public were present at the marriage, and a few minutes after the ceremony was performed the deed was executed and delivered, and she received a check for $2,500.00 from the purchaser. This check was deposited to her account in the bank, and, with the money there on deposit in her name, made an aggregate of $3,835.00 to her credit; that the said Gray following out his well-planned scheme to acquire control, possession and ownership of the money, by misrepresentation, intimidation and fraud, induced her on the eighth day of January, 1917, to draw out of said bank the money she had therein, amounting to $3,812.80, and to place said amount, together with the sum of $22.20, in said bank in the joint names of the Elizabeth Gray and George Gray, subject to the order of either,—the amount so deposited being $3,835.00; that the said George Gray drew out of said account for his own use the sum of $1,835.00, and finally, on the twenty-first of May, 1917, drew out all the remaining money, to wit, $2,000.00, and deposited it to his own individual account in the savings department of the bank, and that the money now stands to his credit in the bank, and that the said Gray refuses to turn over to the complainant any of the property of

the testatrix upon the claim and pretense that all of her property had been given to him during her life.

The thirteenth paragraph of the bill is as follows:

"That at the time of her marriage to George Gray, the said Elizabeth King was a very old woman, illiterate and enfeebled in both mind and body, and did not fully comprehend what she was doing, and from that time to the time of her death, she grew more feeble both in body and mind, and at the time she made the transfer of her money hereinabove stated to the joint account of herself and George Gray, she could not comprehend or understand what she was doing, and fell an easy prey to the subtle and designing influence of her husband; and that the said George Gray, taking advantage of her enfeebled condition, abusing the trust and confidence imposed in him, and exercising to his own selfish ends an undue and improper influence over his wife, induced her not only to transfer her bank account to their joint names, thereby giving him control and virtual ownership of it, but also to turn over to him all her other personal property, in order to defraud the beneficiaries under her will, and particularly your orator."

It is further alleged that the complainant does not know what became of the personal property of the deceased other than the money in bank, and does not know what specific personal property she owned at the time of her marriage to Gray, or what disposition has been made of the same, but charges that he sold the same and converted the same to his own use without the permission or consent of his testatrix.

The answer of the defendant denied all the material allegations upon which the relief prayed for was based, and, as to the allegations respecting the money on deposit and the personal property, it averred that:

"After the said money was deposited in said bank subject to the order of either of them, they, the said Elizabeth, and the defendant, agreed and determined

to build for themselves a more comfortable, convenient and suitable dwelling than they then had on property owned by the defendant, for the cost of which they determined to retain the sum of two thousand dollars in said bank in said savings account, and the balance she freely and voluntarily consented to turn over to the defendant, to be used by him as he might deem best"; and "that he knows of no personal property of value left by the said Elizabeth or owned by her during the said marriage with the defendant, except the money above mentioned, but is advised that before the said marriage she was possessed of personal property which your respondent believes, and so charges, was gotten away from her by the undue influence, misrepresentation and fraud of the plaintiff."

It is quite obvious, we think, that the allegations of the bill state a confidential relation and that this confidence was abused by the defendant and that by undue influence exercised by him over his wife he obtained her whole estate. In 2 *Pom. Eq.,* sec. 956, it is said that, "Courts of Equity have carefully refrained from defining the particular instances of fiduciary relations, in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a confidential relation exist *as a fact,* in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and duties involved in it need not be legal; it may be moral, social, domestic or merey personal"; and in section 963 it is said that the doctrine extends to husband and wife with more or less force. Where the bill shows,—as it does in this case,— that the defendant by an abuse of a fiduciary relation has secured the possession of another's money a Court of Equity has concurrent jurisdiction with courts of law to pass a pecuniary decree for the recovery of the money. 1 *Pom. Eq.,* sec. 186. In *Billage v. Southee,* 9 Hare, 534, it is said that: "No part of the jurisdiction of the Court is more useful than

that which it exercises in watching and controlling trans-
actions between persons standing in the relation of confidence
to each other; and, in my opinion this part of the jurisdic-
tion of the Court cannot be too freely applied, either as to the
persons between whom or the circumstances in which, it is
applied. The jurisdiction is founded on the principle of cor-
recting abuses of confidence, and I shall have no hesitation
in saying it ought to be applied whatever be the nature of the
confidence reposed, or the relation of the parties between
whom it has subsisted. I take the principle to be one of uni-
versal application." The principle was applied by this Court
to transactions between husband and wife in *Livingston* v.
*Hall,* 73 Md. 386, in which JUDGE ALVEY said: "In 2 *Story's
Eq.,* sec. 1395, in treating of the separate property of mar-
ried women, and the manner in which such property is guard-
ed and protected by a Court of Equity, the author says: 'A
married woman having this general power of disposing of her
separate property, the question naturally arises, whether she
may bestow it by appointment or otherwise, upon her hus-
band; or whether the legal disability attaches to such a trans-
action. Upon this subject the doctrine is now firmly estab-
lished in equity, that she may bestow her separate property
by appointment, or otherwise, upon her husband, as well as
upon a stranger. But, at the same time, courts of equity
examine every such transaction between husband and wife,
with an anxious watchfulness, and caution, and dread of un-
due influence; and if they are required to give sanction or
effect to it, they will examine the wife in Court, and adopt
other precautions to ascertain her unbiased will and wishes;'
and many authorities are cited in support of the doctrine thus
stated. And it has been held by courts of high authority,
and upon full and careful consideration, that a gratuitous
conveyance by a wife of her property to her husband will be
held void, unless it affirmatively appears from the attending
circumstances, or otherwise, that it was her voluntary act,
free from any undue influence exercised by the husband.

*Boyd* v. *De la Montagnie,* 73 N. Y. 502; *Darlington's Appeal,* 86 Pa. St. 512. See also *Lowry* v. *Tiernan,* 2 H. & G. 40." In *Boyd* v. *De la Montagnie,* 73 N. Y. 502, it is said: "A Court of Equity will interpose its jurisdiction to set aside instruments between persons occupying relations in which one party may naturally exercise an influence over the conduct of the other. A husband occupies such a relation to the wife and the equitable principles referred to would apply to them in respect to gratuitous transfers by the wife to the husband, however it might be in ordinary business transactions, which the wife may legally engage in. When this relation exists the person obtaining the benefit must show, by the clearest evidence, that the gift was freely and deliberately made. The burden is upon the person taking the gift to show that the transaction was fair and proper." See also *Farmer's Executor* v. *Farmer,* 39 N. J. Eq. 211; *Powell* v. *Pennock,* 181 Mich. 592.

The case being one cognizable in a Court of Equity the legal propositions controlling its determination have been settled by many decisions of this Court, but we need only refer to *Simpson* v. *League,* 110 Md. 286, in which it was said: "When the aid of a Court of Equity is invoked to pass upon the validity of a mere gift, without substantial consideration, made by an aged and ignorant person of what constitutes almost his or her entire estate, the transaction will be closely scrutinized and, unless it be clearly shown that the donor possessed the requisite legal capacity and acted freely and without undue influence or constraint in making the gift, it will not be upheld. The Court in such cases will consider not only the condition of the donor 'at the time of the execution of the instrument and the circumstances of the execution itself * * * but also his previous life, habits and relation to others, so as to ascertain the natural or probable objects of his bounty and especially to discover his settled purpose, if he had any, in regard to the disposal of his estate.' Where fiduciary relations existed between the parties to the trans-

action the burden has uniformly been placed upon the donee to establish to the satisfaction of the Court the facts necessary to uphold the gift. *Colgate Owings Case,* 1 Bland, 370; *Highberger* v. *Stiffler,* 21 Md. 338; *Todd* v. *Grove,* 33 Md. 188; *Cherbonnier* v. *Evitts,* 56 Md. 276; *Zimmerman* v. *Bitner,* 79 Md. 115; *Reed* v. *Reed,* 101 Md. 138.

On the other hand it is equally clear that the law concedes to a person of sound mind the right to dispose of his property in any manner he may deem proper, not inconsistent with its policies, and with such a person, where there is an absence of fraud, or imposition, there is no such thing as an equitable incapacity and a gift voluntarily made and completed by him will not be set aside because he subsequently changes his mind and regrets the transaction or because the Court regards his act as absurd or improvident."

Before examining the testimony it is proper to say that the appellee, George Gray, was not competent, under Art. 35, sec. 3 of the Code, to testify to transactions had with or statements made by the deceased respecting the gift or transfer of the money and other property to him. *Smith* v. *Humphreys,* 104 Md. 285, and *Lowe* v. *Lowe,* 111 Md. 113. Practically all of his testimony as to these matters was excepted to.

Do the facts measure up to the standard of proof required by the law to sustain the validity of the gratuitous transfers or gifts to the defendant? This is the sole defense relied on,—as it is not claimed that the transfer was based upon a valuable consideration. We are satisfied from an examination of the facts contained in the record that the evidence falls far short of the legal requirements to sustain these gifts. Elizabeth Gray was an old, feeble, and very illiterate and igorant colored woman at the time of her marriage to the defendant. He was about forty-eight years of age; she about seventy, weak in body and mind,—mentally she appears to have been childish and bordering on senile dementia. He was a widower with seven children, and the haste and other

circumstances under which he married this old and decrepid woman were most unusual, and suggestive in view of the fact that within about five months after his marriage he had possessed himself of every dollar of her property. The condition or her mind and body was such as to render her an easy victim to undue influence, and the domination of a stronger mind. Perhaps the best indication of her mental condition and of her utter unfitness to marry the defendant is found in the testimony of Charles H. Arnold, a colored minister, and of the defendant himself. Arnold testified as follows: "Q 8. State whether or not you noticed any change upon your last visits in her physical and mental condition, and if so, what? A. Physically she seemed to grow very much weaker, and was scarcely able to get around; *mentally she seemed to hardly know what was going on.* Q 9. State whether or not George Gray made application to you about the middle of November, 1916, to marry him and Elizabeth King, and state whether or not you performed the ceremony, and if not, why not? A. The night before his marriage George Gray asked me to perform the ceremony. I did not perform the ceremony, the reason why I thought it was an unchristian act, and inasmuch as my office was a sacred one I felt it would be out of place that I should perform the service under such circumstances. *He acknowledged to me that he did not love her and that he had not courted her, and that he was not marrying her for a wife.* Q 10. At that time did you have any further conversation with George Gray, and if so, what? A. Yes. I told him that he knew she was not his equal, that he was a young man practically speaking, and that should he marry her that he would be taking advantage of her ignorance and weakness, that she was not able to keep house, and that she had lost all her energy, that she were not sufficient to care for children, and that it would eventually break her down entirely, and that he would have trouble about the property, as I understood it, that she had given this property to her nephew at her death, and that it would bring on a law

suit. He acknowledged that I was right and that he would take the license back to the Court returned unmarried."

The defendant, after testifying that he met the deceased in October, and made arrangements to bring her down on Sunday to see his children, and that it rained on Sunday, said: "Then on Monday I was talking to her and I said to her I would love to have a housekeeper like you; she said, yes, if you married me, of course I would keep house for you. I said, if you meant that I certainly would call to see you. After I kept talking with her she said Mr. Johnson was coming to see her and after she got an answer from Johnson she would let me know. I went back again on Wednesday, she had not gotten an answer from Johnson. Thursday I went back and she had not gotten any answer still, then she told me that I could marry her if I wanted, and then we made arrangements to marry."

"Q 6. What day did you first arrange to be married? A. We arranged to be married on Thursday. Q 7. Were you married at that time? A. No, I went to Brother Arnold and he refused to marry me. Q 8. After visiting Arnold and he refusing to marry you, what did you then do? A. Then I went to her and carried the license and told her that I did not suppose that we would be married, *and she began to cry,* and said every time she undertook to do something, some one tried to upset her, then I went home. The next morning I went back, and after making a little arrangments, and then we were married."

We do not find it necessary to discuss all facts appearing in the record. We have considered them all, and our conclusion is that they are not sufficient to satisfy the Court, under the principles announced in the cases cited, that the alleged gifts of money and other property of the deceased to the defendant ought to be upheld. It follows that the decree appealed from must be reversed.

*Decree reversed, with costs and cause remanded.*