FANNIE GERSON *v.* JOSEPH GERSON ET AL.

[No. 56, October Term, 1940.]

*Decided June 10th, 1941.*

The cause was reargued before BOND, C. J., SLOAN, JOHNSON, DELAPLAINE, COLLINS, and FORSYTHE, JJ.

*William C. Walsh* and *Leonard J. Harmatz*, with whom was *Edward J. Ryan* on the brief, for the appellant.

*William A. Gunter*, for the appellees.

JOHNSON, J., delivered the opinion of the Court.

Fannie Gerson, widow of Myer Gerson, late of Frostburg, Allegany County, Maryland, deceased, on November 24th, 1939, filed her bill of complaint in the Circuit Court for Allegany County, in equity, against Joseph Gerson, Samuel Gerson and Fidelity Savings Bank of Frostburg, alleging in substance (a) the death of Myer Gerson on March 31st, 1938, further that in addition to herself Myer Gerson left eight children surviving him by a previous marriage, of whom Joseph and Samuel were unmarried; (b) that Myer Gerson left a last will and testament duly probated in the office of the Register of Wills for Allegany County, whereby he devised to the plaintiff his home on Ormond Street in Frostburg, together with the furniture contained therein, and of the remainder of his estate he devised one-third to her and the balance to his children, excluding Joseph and Samuel; (c) that prior to his death Myer Gerson and Fannie Gerson owned, as tenants by the entireties, two parcels of real estate located in Frostburg, Maryland, known as the hotel and garage properties; (d) that the plaintiff was advised that on March 17th, 1938, a paper was executed purporting to be a deed from the plaintiff and her husband conveying the garage and service station to Samuel and Joseph; that she had no knowledge of ever having signed such instrument purporting to be a deed for said properties, and that she received no consideration whatsoever for the transfer thereof; (e) that subsequently Samuel and Joseph Gerson entered into a series of discussions with the plaintiff, representing to her their willingness to purchase her interest in the estate of her deceased husband and pay her therefor $2300, and such discussion resulted in an agreement between the plaintiff and her two stepsons which was executed April 25th, 1938, and duly recorded; further that at the time of the execution of that paper Samuel and Joseph Gerson "fraudulently and without consideration" caused her to

execute two deeds, one conveying the hotel property and the other being a confirmatory deed intending to correct an original deed purportedly made by herself and her husband to them on March 17th, 1938; (e) that the purported deeds were never read to nor understood by the plaintiff, who could neither read nor write, and she had no knowledge she was signing a deed for the hotel or for the garage property, but understood she was merely signing an agreement releasing her interest in the estate of her deceased husband for $2300. In the seventh paragraph of the bill of complaint, the plaintiff alleged that the hotel property had been sold by Joseph and Samuel to one Joseph De Michele et al. for $3700, and by the following paragraph she alleged that the garage property, to which Samuel and Joseph acquired title from her by fraud, was valued in excess of $25,000.

It was alleged in the ninth paragraph that Samuel and Joseph had applied to Fidelity Savings Bank of Frostburg for a loan of $15,000, to be secured by a mortgage upon the garage property, which loan if obtained would however deprive her of her interest therein; further that Joseph and Samuel had failed to account to her for the sum of $3700 received by them for the sale of the hotel property and had failed to pay her any rent upon the garage property. The bill prayed that the deeds referred to be vacated by reason of fraud exercised upon the plaintiff by Joseph and Samuel Gerson, that a resulting trust be declared in favor of the plaintiff as to the garage property, that Joseph and Samuel be required to account to the plaintiff for the sum received from the sale of the hotel property and for rents from the date of Myer Gerson's death upon the garage property, and for an injunction restraining the Fidelity Savings Bank of Frostburg from paying to the defendants any of the proceeds of the $15,000 mortgage loan.

Before the bill of complaint had been answered by Joseph and Samuel Gerson an agreement between the Fidelity Savings Bank of Frostburg and the other parties to the cause was entered into, whereby the bank was re-

imbursed for all sums advanced the Gersons on account of the loan, released its mortgage and was by the plaintiff dismissed as a defendant.

Samuel and Joseph Gerson answered the bill of complaint, denied its material allegations, and although admitting that their stepmother could not read, asserted that no fraud was practiced upon her, because she fully understood the facts concerning her husband's estate and agreed to sell them the properties mentioned for $2300, of which sum they had paid her $2000, in cash, but were unable to pay a $300 note representing the balance, and because of this she was so offended that she engaged counsel, as a result of which the bill of complaint had been filed against them.

Testimony in the cause was taken orally before the chancellor in open court, as a result of which the plaintiff contended that she was a victim of constructive as well as actual fraud practiced upon her by her two stepsons and their cousin, Milton Gerson, who had recently been admitted to the bar of Allegany County. The constructive fraud was claimed by her to exist because of the fact that she was ignorant and entirely illiterate and the three persons mentioned occupied a fiduciary relationship toward her, and it became their duty to inform her fully of the transactions she was entering into; that they failed in this duty by representing or causing her to believe that her late husband owned the Ormond Street property and furniture therein as well as the hotel and garage properties, whereas the two properties last mentioned were upon his death owned by the plaintiff absolutely by virtue of the fact that title to them was in herself and husband as tenants by the entireties, and they had not met the burden cast upon them to show the fairness and justice of the transaction, because for $2000 in cash she had parted with property worth many times this amount. The actual fraud which she claimed had been established consisted in falsely representing to her that Myer Gerson himself owned the hotel property, the garage property in addition to the home; that he owed considerable sums

of money and since under her husband's will she took the home on Ormond Street and sold them her interest in his entire estate for the price mentioned she was making a good sale and receiving at least full and fair value for what she was parting with, because when his debts were paid Samuel and Joseph Gerson, in order to acquire title to the properties in question, would necessarily have to pay them, a fact that would render less valuable a one-third interest in the residue of Myer Gerson's estate.

Mrs. Gerson further asserted that to the best of her judgment and understanding she had not signed any of the deeds produced for any of the properties and had not signed a renunciation to act as one of the executors of her husband's estate which on April 26th, 1938, was presented to the Orphans' Court for Allegany County and resulted in establishing Milton Gerson as sole executor.

The chancellor in an opinion filed in the cause rejected Mrs. Gerson's contention that her signatures to the deeds and renunciation were forged. He concluded that because she accepted the home and furniture therein contained on Ormond Street under the will without question she must have understood the other terms of settlement. He also recognized an equitable claim of $5000 which the defendants had set up against their father for money expended by them in improving the garage property, but failed to give any consideration as to whether the grantees in the deeds and their cousin, Milton Gerson, occupied a fiduciary relation to Mrs. Gerson and therefore did not consider the effect of such a relation upon the transactions here attacked.

Fannie Gerson was fifty-three years of age at the death of her husband in March, 1938. She married Myer Gerson in July, 1918. No children were born as a result of that marriage, but at the time of its celebration he was a widower with eight children ranging in ages from six to eighteen years. From the date of her marriage to him, Fannie Gerson entered his home, took up her duties as a faithful and obedient helpmate and assisted in rearing his infant children by the former marriage. Mrs. Gerson

is to the fullest extent illiterate, being unable to read or write, but has learned to copy her own name in crude fashion. Indeed, her acquisition of this habit, coming as it did the hard way, has produced a signature which may be characterized as inimitable.

As already stated, at the time of his death, Myer Gerson and Fannie Gerson held as tenants by the entireties title to two valuable pieces of property located in Frostburg, Maryland, known as the "hotel property" and the "garage property," the former worth $4000 and the latter at least $12,000. There was a mortgage of $5000 on them when he died. Myer Gerson also owned individually a home on Ormond Street worth $3000 and other real and personal property worth $1710. By the terms of his last will and testament, he devised to his widow that home and furniture therein as well as one-third of the residue of his estate.

While the hotel and garage properties were held by decedent and Fannie Gerson as tenants by the entireties, and were therefore from the time of his death owned by her absolutely, she did not until shortly before she filed the present bill of complaint have knowledge of that fact, and unless she is wholly unworthy of belief, it must be concluded that by virtue of the representations made to her from others interested in enlarging the shares they would receive of her husband's estate as well as from the advice tendered her by her husband's nephew, who had been recently admitted to the bar, this elderly, ignorant, unadvised and illiterate widow, who was without the slightest business training or experience, upon the death of Myer Gerson, was led to believe that her rights in the properties mentioned were a one-third undivided interest. The task of creating that belief on her part was not hard to accomplish, for, having no knowledge that the two most valuable properties were owned by her outright, when the will was read to her she would naturally have concluded that in addition to the home devised her she took one-third of the residue.

The only persons shown by the record to have had any

dealings whatsoever with her until shortly before the filing of the bill of complaint are Joseph Gerson and his brother, Samuel, two of her stepsons, and the young attorney who was the nephew of her deceased husband. Apart from the trust and confidence which by reason of her complete dependency she is shown to have placed in them, it would hardly be contended that a fiduciary relationship did not exist between them and her. The two stepsons, whom she had from tender years cared for, were then grown and engaged in business, and it may be inferred from the record that they were shrewd and capable business men, and since she was not in receipt of any independent advice or information except from them and the attorney (their cousin), apart from the family relationship and certainly with it, there existed a fiduciary relation between them. If that relationship was used by the attorney and his two cousins in a matter that unjustly deprived Mrs. Gerson of her property, the transaction should be set aside by a court of equity. *Wlodarek v. Wlodarek*, 167 Md. 556, 566, 175 A. 455; *Farmer v. O'Carroll*, 162 Md. 431, 160 A. 12; *Coburn v. Shilling*, 138 Md. 177, 113 A. 761; *Scher v. Becker*, 163 Md. 199, 161 A. 167; *Chase v. Grey*, 134 Md. 619, 107 A. 537; *Williams v. Williams*, 63 Md. 371; *Simpson v. League*, 110 Md. 286, 72 A. 1109; *Livingston v. Hall*, 73 Md. 386, 21 A. 49; *McGill v. Nichols*, 157 Md. 287, 145 A. 773; *Mead v. Gilbert*, 170 Md. 592, 185 A. 668; *Tracey v. Tracey*, 160 Md. 306, 153 A. 80; 23 *Am. Jur., Fraud and Deceit*, sec. 14, pages 763-766; 26 *C. J.* sec. 18, pages 1076-1078; *Restatement of the Law, "Contracts,"* sec. 498; *Williston on Contracts*, (4th Ed.), secs. 1625A, 1737.

In *Chase v. Grey*, 134 Md. at page 623, 107 A. at page 538, we said: " 'Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a confidential relation exists as a fact, in which there is confidence reposed on one side, and

the resulting superiority and influence on the other. The relation and duties involved in it need not be legal; it may be moral, social, domestic, or merely personal.' * * * In *Billage v. Southee,* 9 Hare 534, it is said that—'No part of the jurisdiction of the court is more useful than that which it exercises in watching and controlling transactions between persons standing in the relation of confidence to each other * * *. The jurisdiction is founded on the principle of correcting abuses of confidence, and I shall have no hesitation in saying it ought to be applied whatever be the nature of the confidence reposed, or the relation of the parties between whom it has subsisted.' "

Again in *Simpson v. League,* 110 Md. 286, 72 A. 1109, 1111, it was held: "When the aid of a court of equity is invoked to pass upon the validity of a mere gift, without substantial consideration, made by an aged and ignorant person, of what constitutes almost his or her entire estate, the transaction will be closely scrutinized; and, unless it be clearly shown that the donor possessed the requisite legal capacity and acted freely and without undue influence or constraint in making the gift, it will not be upheld."

In the recent case of *Farmer v. O'Carroll, supra,* a Mrs. Farmer, past middle age, filed her bill of complaint against Peter J. O'Carroll et al., charging that as a result of his representations, he being her father confessor and spiritual adviser, the plaintiff had, in the belief that his advice was for her benefit and interest, been prevailed upon to deliver to him for the associated professors of Loyola College certain Government bonds representing an enormous sum of money; that the plaintiff was led to believe that the bonds were being loaned and would be returned upon her request, she at all times receiving interest thereon during the loan, and that relying upon such representations and without reading a paper presented by him she signed the same and thereby transferred to the defendant all of said bonds. We held on a demurrer admitting these allegations that the relation between a spiritual adviser and a member of his congre-

gation was generally of a confidential nature, and persons situated in such relation seeking relief had to prove neither actual fraud nor that coercion had been employed to induce the "gift, grant, contract, conveyance, or transfer of property" [162 Md. 431, 160 A. 17], but that the party benefited thereby carried the burden of proving that the power conferred by the relation was not abused. See also authorities there cited.

Would it be contended that a less strict rule would apply in the present case? It must be kept in mind that Mrs. Gerson could neither read nor write, but apart from this fact it is believed that when, as here, the confidential relation has once been established, the rule that the burden rests upon him who has benefitted by that relation to prove its non-abuse is universal.

As was said at the outset, at Myer Gerson's death his widow owned outright a garage and hotel property worth $16,000. Deducting therefrom the $5000 mortgage against those properties their net value was $11,000. Under his will the widow was devised and bequeathed the home and contents valued at $3000. The combined values (net) of the three properties were, therefore, $14,000, and the estimates producing that sum are entirely conservative. But as the result of the transactions complained of, Mrs. Gerson now finds that in addition to $2000 she has received in cash, her only property consists of her home and furniture left by the will; that the other properties whose net values were $11,000 are claimed by her two stepsons. She has therefore parted with property worth $11,000, together with value of the one-third residue left to her by her husband's will. The mere statement of what has happened seems quite sufficient to show that the relation which appellees and their cousin bore to her has been grossly abused and certainly it has not been satisfactorily explained by them to the extent of removing the burden of proving the fairness and justice of the transaction. It will be noted that in our consideration of this aspect of the case we have used the terms "fiduciary relation" and "confidential relation" in-

terchangeably, not alone because both are in law regarded as corrupt or immoral bargains, but for the further reason that the facts in the case apply alike to both terms.

It is unnecessary to prolong this opinion by considering the questions of actual fraud and forgery, and we rest our consideration of the case upon the finding that inasmuch as Mrs. Gerson imposed confidence and trust in appellees and their cousin, in the transactions referred to, that she was wholly illiterate and without independent advice, they occupied a confidential and fiduciary relation toward her which has placed upon them the burden of proving the fairness and justice of the entire transaction, which burden they have failed to meet, in view of which Fannie Gerson must be regarded as a victim of constructive fraud.

We might also add that the chancellor's finding of an equitable claim in favor of appellees against the garage property for $5000, a finding which apparently greatly influenced him in dismissing the bill, is in our judgment not supported by the evidence. The alleged claim existed in the form of a $5000 note of Myer Gerson, payable to appellees and dated February 28th, 1938. It was claimed to have been given them for repairs they had made to the garage property, but the contractor, who was called as a witness for appellees, testified that while he made the improvements to the garage property he was paid by Myer Gerson therefor. The plumber, who also was called by them, testified that upon Myer Gerson's death there was a balance due him of only $350, Myer having paid him down to that sum, whereupon the following statement was made by appellees' counsel and appears in the record: "There was a note taken out signed by Myer Gerson and Joe Gerson at the Frostburg National Bank, an F. H. A. loan, which was payable at the rate of $47 a month, but from time that the note stated to become due up until Mr. Gerson's death, that he himself paid those monthly payments. At the time of Myer Gerson's death there was approximately $350 still due on the note. When

the boys took over the garage property they paid the balance. I am giving that for the information of my brother. We don't contend that they paid the whole amount."

In addition, Dr. W. O. McLane, of Frostburg, testified to having treated Myer Gerson for an incurable disease prior to his death; that in the month or six weeks prior thereto Gerson was getting four grains or its equivalent of morphine daily, and while he may have had lucid intervals he would be without "any ability to reason" or "act at all intelligently." It was during this period that the note, according to its date, was executed.

The decree appealed from will be reversed and the cause remanded, to the end that a new decree may be passed embodying the following provisions: (a) Canceling, annulling and voiding all deeds purporting to have been made by Fannie Gerson, individually, or in conjunction with Myer Gerson, to appellees or either of them conveying the St. Cloud Hotel property and the garage and filling station property, with a proviso that if, as alleged in the bill of complaint, the hotel property has by appellees been sold, then and in that event appellees are to be charged with such amount of money as the chancellor may determine they received from its sale; (b) appellees are also to be charged with and must account for the reasonable rental value of the garage and filling station property from March 31st, 1938, the date upon which Myer Gerson died until the date of such decree; (c) they must also account for the rentals received by them for the hotel property from March 31st, 1938, until the date of such decree unless in the meantime, such property has by them been sold, in which event they are to account for rentals thereof up to the time of its sale; (d) appellant, Fannie Gerson, is to be charged with the sum of $2000, which amount she has shown to have received from appellees for a one-third undivided interest of the estate of her deceased husband, exclusive of the home and contents located on Ormond Street and must surrender to appelles the $300 note she holds from them, which as shown by the evidence has not been paid. It

will, of course, unless the parties can agree upon rentals, rental values, sales and the amount realized therefrom, be necessary for the chancellor to hear testimony in order to determine such matters prior to reforming the decree, but this course is under the circumstances unavoidable.

*Decree reversed and cause remanded for further proceedings not inconsistent with the views herein expressed, with costs to appellant.*

DELAPLAINE, J., filed a dissenting opinion as follows, in which SLOAN, J., concurs.

The contention of the appellant in this case is that five recorded instruments bearing her purported signature are all forgeries. The following are among the reasons why the story does not seem to me to be convincing:

First. The appellant swore that she never signed any deed or any other instrument prior to her husband's death, and that she had no knowledge whatever of any family settlement until more than a year after his death. There is no question, however, that she knew that her husband had made a will; she received the home and the furniture; and she knew that she had been devised the hotel, because she sold it and was paid for it by cash and note. Throughout the course of a year and a half, she never made any complaint about the operation of the garage by the appellees. It is difficult to believe that she had no knowledge that the garage had been conveyed.

Second. Joseph and Samuel Gerson had paid $100 per month as rent for the garage prior to the family settlement in March, 1938. Nothwithstanding that they continued to operate it, she never made any question thereafter about the rent.

Third. While she swore in the court below that she had never signed any of the five instruments, yet when she was asked whether it was true that she had told her lawyer from Baltimore that she had signed deeds for all of the properties, she answered: "Yes."

Fourth. When interrogated about the conference in the home of Milton Gerson, attorney, on March 17th, 1938, she admitted that she had attended the conference, but she swore that the conference was held about a month after her husband's death. Myer Gerson died on March 31st, 1938. His daughter, Mary Sherman, of Newark, New Jersey, testified that she came to Frostburg on March 4th, 1938, and it was in March that her step-mother came into the house after attending the conference and exclaimed: "I went to a meeting * * * and * * * everything is settled all right." Four witnesses corroborated Mrs. Sherman's statement that she was in the house on the day her step-mother came back from the conference. Mrs. Sherman also testified that she left Frostburg on April 1st, 1938, and did not return until about a year later.

Fifth. Milton Gerson testified that he retyped the second page of the will on March 17th, 1938, in order to make himself and Mrs. Gerson executor and executrix. Mrs. Gerson admitted that she had asked him who would serve as executor, and he replied: "Suppose I appoint you." She was then asked: "Was this before Myer died or afterward?" She answered: "After." This conversation could obviously not have occurred after the death of her husband.

I do not overlook the fact that a handwriting expert offered his opinion that the signatures on all five instruments were forgeries. But the courts have commented upon the inherent weakness of expert testimony . Oftentimes experts testify in support of a certain theory because of their ability to express opinions favorable to the party who calls them to the witness stand. Sometimes they receive fees which are far greater than the ordinary witness fees. Frequently their testimony appears to be largely the result of bias, which naturally results from their employment. In some instances experts of equal credibility and skill give contrary opinions. Consequently opinion evidence, while entitled to some weight, is not so conclusive that error is committed if the court

refuses to follow it. There is no rule of law which requires judges or juries to relinquish their own judgment to accept the opinions of expert witnesses. The general rule is that opinions have only such probative value as they reasonably deserve under all the circumstances of the case. While expert testimony is an aid in determining an issue and cannot be arbitrarily ignored, the tribunals should be guided in making a decision by their common knowledge and experience as applied to the facts of the case, and they have a right to follow their own convictions, although their decision may be contrary to the opinion evidence of experts on the subject. *United States v. Gower,* 50 Fed. 2nd 370, 371; *The Conqueror,* 166 U. S. 110, 17 S. Ct. 510, 519, 41 L. Ed. 937; *Dayton Power & Light Co. v. Public Utilities Commission,* 292 U. S. 290, 54 S. Ct. 647, 652, 78 L. Ed. 1267; 2 *Jones on Evidence,* secs. 390, 391, 392, 556. The frequent use of evidence obtained from a comparison of handwriting indicates its importance in determining the issue as to the disputed validity of a written instrument, and the tendency of the courts in recent years has been toward according greater weight to it. Nevertheless, many courts have called such evidence "weak and unsatisfactory." 2 *Jones on Evidence,* sec. 556.

The appellant relied on the fact that one of the signatures is spelled "Fannie," while the others are spelled "Fanny." I do not attach great importance to this difference. The Gersons apparently did not pay much attention to spelling. The brief of the counsel on one side of the case refers to the appellant's husband as "Myer"; and the brief on the other side spells his name "Meyer"; while in the record it is "Myer" in some places and "Meyer" in others. I have examined the signatures on the original instruments. It is true that one differs from the others, but it is quite likely that the signature of an illiterate person may vary from time to time. Moreover, I notice that the signature which appears different from the others is similar to her signature on an identification card which she signed at the Fidelity Savings Bank of Frostburg.

In the present case the signatures of Fannie Gerson were witnessed by (1) an intimate friend, (2) a disinterested workman, who happened to be in the office at the time, (3) a member of the bar and (4) a notary public. Should we lightly brush aside all this evidence and make them liable to punishment for perjury? A certificate of acknowledgment by a notary public is proof of the execution of a deed, although not absolutely conclusive. Public policy forbids the certificate of such an official to be repudiated except upon the strongest evidence. Thus, when a person named as grantor in a deed swore that he had not signed it, and some of his handwriting experts testified that they believed the signature was a forgery, the Supreme Court of Appeals of West Virginia said that, inasmuch as four witnesses declared they saw the grantor deliver the deed to the grantee, the testimony of the grantor and his experts was not sufficient to justify a decree of annulment. The court held that where a certificate of acknowledgment is regular on its face, a strong presumption exists in favor of its truth, and the burden of proof is upon the party assailing it. While such a certificate may be impeached, the proof necessary to sustain such a charge must be of the clearest and most convincing character. *Swiger v. Swiger,* 58 W. Va. 119, 52 S. E. 23. Likewise, the Supreme Court of Illinois has declared: "Again, there is nothing that renders it at all probable that the notary public, who certified to the acknowledgement, would join in perpetrating a forgery. His certificate imports verity, and can not be overcome but by clear and satisfactory evidence. And the evidence of appellant, and the opinion of experts that the signature is not appellant's, are not sufficient." *Tunison v. Chamblin,* 88 Ill. 378, 388.

In Maryland the persons whom the Governor is directed by law to appoint, with the advice and consent of the Senate, as notaries public shall possess "known good character, and integrity and abilities." They must have resided in the State at least two years prior to their appointment. They are required to give bond with securi-

ty to be approved by the Governor. They receive a commission signed by the Governor and the Secretary of State under the Great Seal of the State. They must subscribe to an oath of office before they are qualified to enter upon the discharge of their duties. Code, art. 68, sec. 1; art. 36, sec. 25. Miss Ruth L. Dicken, who has been serving as a notary public for more than twelve years, took the acknowledgment of Mrs. Gerson on three deeds on April 26th, 1938, and certified that the appellant personally appeared and acknowledged the instruments. Miss Dicken signed her name as notary public and attached her official seal on all three deeds. She testified that she recognized Mrs. Gerson and saw her sign her name to the deeds. Such written instruments should not be exposed to the danger of falsehood or the uncertainty of memory. When a duty has been laid upon a public officer, the presumption is that he has performed it according to law. *Swiger v. Swiger,* 58 W. Va. 119, 52 S. E. 23, 30.

For these reasons I am unable to concur in the conclusion reached by the majority of the Court. I am authorized to say that Judge SLOAN concurs in this dissent.